Maivan LAM, Plaintiff–Appellant,

v.

UNIVERSITY OF HAWAI'I; Albert Simone, in his capacity as President of the University of Hawai'i; and Jeremy Harrison, in his capacity as Dean of the Richardson School of Law, Defendants–Appellees.

No. 91–16587.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1992.

Submission Deferred Nov. 19, 1992.

Resubmitted April 12, 1993.

Submission Deferred Feb. 17, 1994.

Resubmitted May 26, 1994.

Decided Oct. 11, 1994.

As Amended Nov. 21 and Dec. 14, 1994.

Catherine Fisk, Los Angeles, CA, for plaintiff-appellant.

Steven S. Michaels and Warren Price III, Atty. General's Office, Honolulu, Hawai'i, for defendants-appellees.

Carin Ann Clauss, Madison, WI, and Joan E. Bertin, Isabelle Katz Pinzler, New York City, for amici curiae American Civ. Liberties Union, Asian American Legal Defense and Education Fund, Asian Law Caucus, Asian Pacific American Legal Center, Center for Constitutional Rights, Equal Rights Advocates, Nat. Conference of Black Lawyers.

Before: BROWNING, NORRIS and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Professor Maivan Clech Lam, a woman of Vietnamese descent, claims that the University of Hawai'i's Richardson School of Law ("the Law School") discriminated against her on the basis of her race, sex and national origin both times she applied for the position of Director of the Law School's Pacific Asian Legal Studies Program. Lam first applied for the directorship during the Law School's 1987–1988 hiring search (the "first search") and became a finalist in that search; however, the faculty cancelled the search without hiring anyone. She again applied during the Law School's 1989–1990 search (the "second search"), but the Law School offered the position to another candidate. When that candidate declined to accept the position, the faculty again cancelled the search. Lam also claims that the Law School's actions constituted unlawful retaliation.

Lam filed suit under 42 U.S.C. § 2000e *et seq.* ("Title VII") and other anti-discrimination statutes.[1] The district court granted partial summary judgment to defendants as to the first search, then, after a bench trial, granted final judgment to defendants as to the second search. Because we find a genuine issue of material fact regarding whether the defendants violated Title VII in considering Lam's application during the first search,

---

1. Lam also alleged violations of 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 2000d (Title VI) and 20 U.S.C. § 1681 *et seq.* (Title IX). The Title VII claim was the focus of the litigation, however, and the district court's conclusions of law regarding the other alleged statutory violations are extremely summary, simply restating the overall conclusion that Lam did not prove discrimination on the basis of race, sex or national origin. Insofar as our remand of Lam's Title VII claim causes the district court to amend its conclusions regarding discrimination, a reconsideration of its other statutory rulings will, of course, be necessary.

we reverse the award of partial summary judgment and remand for trial as to that search.[2] However, finding no material legal errors in the district court's decision as to the claimed discrimination and retaliation during the second search, we affirm the court's award of final judgment as to that search.

### I.

Lam was born in Vietnam of French and Vietnamese parentage, and is fluent in French, English, Vietnamese and Thai. She graduated *magna cum laude* with a B.A. in English and Economics from Marygrove College in Detroit, Michigan in 1965. After college she received a masters degree in Southeast Asian studies at Yale University in 1967, and was later awarded a Ford Foundation Fellowship. After several years as a full-time mother, Lam taught anthropology courses at Hawai'i Loa College between 1974–1981. She then obtained a second masters degree from Yale in Anthropology.

In 1982, she collaborated with her husband, a professor at the University of Hawai'i, on two monographs on administration and social movements in Vietnam. In 1984, she graduated from the Richardson School of Law, after having completed an externship with the Chief Justice of the Federated States of Micronesia. While she was a law student, she wrote two law review articles on Hawai'ian land law that were published after her graduation: one in the *Journal of Legal Pluralism* and the other in the *University of Washington Law Review*. During and after law school, Lam was assistant director of the Law of the Sea Institute, an organization that was affiliated with the University of Hawai'i and under the direction of Emeritus Law Professor John Craven. After graduating from law school, Lam taught courses at Hawai'i Loa College, served as a lecturer in the University of Hawai'i's political science department, and gave guest lectures before Professor Craven's ocean law class at the Law School.[3]

### A.

In the fall of 1987, the Law School began a hiring search for a full-time director for its Pacific Asian Legal Studies ("PALS") program.[4] Approximately 100 persons applied for the position, including Lam. The Law School established an appointments committee consisting of Professor Mari Matsuda, who was the chair, Professors Eric Yamamoto and Randall Roth, and two students to screen applicants and to recommend a list of finalists for review by the full faculty. By

2. Since it was ruling upon a motion for summary judgment, the district court made all factual inferences in favor of Lam and did not make credibility determinations. We must do the same on review of the court's decision. In doing so, of course, we express no view regarding the truth of such allegations of bias. Specifically, we do not intend by anything we say in this opinion to suggest or imply that any individual engaged in any speech or conduct of a biased or prejudicial nature.

3. Lam also belongs to several professional associations and has served on the Board of the Commission on Folk Law and Legal Pluralism of the International Congress of Anthropological and Ethnological Sciences. In addition, she is a member of the Hawai'i bar.

   After the initiation of the present litigation, Lam was hired by the University of Wisconsin law school. She later accepted an associate professorship at CUNY law school, which began in the fall of 1992.

4. The advertisement for the position read:

Duties: To develop an internationally recognized comparative law program, with a focus on the Pacific Basin region. The position may entail conference organizing, grant-writing, liaison with Pacific–Asian scholars, and working with students and systems. Additionally, teaching of related courses, scholarship, professional activities, committee. *Desirable Qualifications:* An outstanding academic record and proven or potential excellence in scholarship and teaching. Foreign language abilities; familiarity with Asian, Pacific and international scholars, organizations, international law, or comparative law. Ability to teach courses in the J.D. program. Should be able to teach courses in Public or Private International Law, International Business Transactions or a comparative law course on specific legal systems. Administrative experience and creative talents are important..... *Closing Date:* January 15, 1988.

some time in January 1988, the appointments committee had prepared a list of ten names, including Lam's, for submission to the faculty. Five of the ten candidates were women, among whom were two of the three ethnic Asians recommended. Matsuda chose Lam as one of her top two candidates.

Because of a previously scheduled semester's leave, Matsuda had to resign from the appointments committee. Professor A., a senior faculty member, approached Matsuda expressing his interest in becoming chair and asking that she forward his request to the Dean of the law school. Matsuda, who was a friend of Lam's, knew that Professor A. and Lam had had a "run-in" the previous year.[5] Matsuda nonetheless passed along Professor A.'s request to the Dean while also recommending that a woman faculty member be appointed to the committee. Subsequently, Professor A. was appointed to the committee along with a woman professor. At the same time, Professor Williamson Chang, a member of the PALS committee, began to attend appointments committee meetings on an ex officio basis.[6]

After Professor A. became chair of the appointments committee, the group discussed forwarding one name, that of a white male, rather than ten names to the faculty. When Chang informed Lam of this development, she became concerned and set up a meeting with the Dean to discuss the situation. Lam told the Dean of her prior problems with Professor A., but said that she was worried that if Professor A. were forced to resign from the committee his colleagues would blame her. She thus did not request Professor A.'s removal from the committee, but instead asked that the committee recommend five names to the faculty instead of one.

The Dean, in turn, mentioned to her the idea of cancelling the search and reopening it to accommodate an Asian male candidate who had missed the application deadline. In his view, this course of action had the dual benefit of mooting any possibility of obstruction by Professor A., since there would be a new chair for the new search, and of allowing consideration of the late applicant. Lam disagreed with his proposal, stating that it would be unfair to reopen the search.

There was vigorous debate regarding Lam's application at a March 2, 1988 joint meeting of the PALS and appointments committees. Professor A., in particular, asserted that Lam was not collegial, was a poor scholar, and had poor administrative ability. He finally stated that in his view Lam was unfit to teach anywhere on the University of Hawai'i campus. He also labelled Lam's in-print criticism of another (white male) faculty member inappropriate. Craven spoke up strongly for Lam at this meeting.

Both Craven and Chang later went to the Dean to complain of Professor A.'s behavior and to recommend his removal as chair of the appointments committee. At approximately the same time, Lam spoke to the campus EEO officer about the Dean's idea of reopening the search in order to consider the late applicant, leading the EEO officer to call the Dean and advise him against that plan. In accordance with Lam's request and the EEO officer's recommendation, the Dean then announced that the faculty was not to consider the late applicant. The Dean also announced that Professor A. had resigned from the committee and that Roth had replaced him as chair. Although most of the faculty believed that Professor A. resigned because of a conflict with Lam, the Dean never attempted to alleviate the resulting controversy by publicly explaining the events.

The candidate list was eventually narrowed down to four, including Lam, whose applica-

---

5. The incident involved funding sought by Professor A. for a workshop he attended in Goa, India. Lam allegedly exposed certain misrepresentations made by Professor A. in connection with this funding, embarrassing him. As a result, Lam was dismayed when she found out that Professor A. would be replacing Matsuda as chair of the appointments committee.

6. The PALS Committee was a separate committee charged with developing policy with respect to the PALS program; Craven was another of its members.

tions were considered by the full fifteen-member faculty of the law school at a meeting on March 18. At that meeting both Craven and Professor A. spoke strongly for their respective positions regarding Lam. Their polarization apparently made the rest of the faculty uncomfortable. Although a white male candidate apparently received the highest number of votes, a consensus did not form around any of the candidates and there was no decision to extend any offer of employment. Two weeks later a bare majority of the faculty voted to cancel the search.

## B.

In response to the first search's cancellation, Lam filed a discrimination complaint with the office of the University vice-president. Although the University rejected her administrative grievance after an investigation, it issued a report detailing confidentiality breaches and procedural violations in the PALS director search process. The University vice-president told Lam that he would issue stern instructions to the Law School Dean requiring that the next search for the PALS directorship be conducted pursuant to strict guidelines, with the position's qualifications explicitly drawn. He asserted that it would be a "fishbowl operation" consistent with the highest standards of procedure.

At a Law School faculty meeting in September 1988, two University EEO officers discussed selection procedures and recommended, among other things, the use of rating sheets and a clear definition of the PALS program and its director. At the Dean's request, Professor Matsuda prepared a memo on search procedures for the law school in which she proposed that desired characteristics be ranked and that minority applicants be encouraged. Further procedures outlined in University affirmative action guidelines mandated that interview questions, rating sheets, selection evaluation

sheets, and copies of recruitment/selection forms be kept on file for three years.

Lam and a support group that had formed around the issue of her treatment by the University leveled charges of discrimination and procedural irregularities in the first search in many outside fora, including the Equal Employment Opportunity Commission, the American Association of Law Schools (AALS), the ABA, the Hawai'i legislature, and the press. As a result, Lam's allegations received both newspaper and radio coverage, and the Dean of the Law School and the President of the University were "cross-examined" about them at an AALS meeting relating to the Law School's request for accreditation.

The faculty decided to reopen the search for a PALS director in 1989. The announcement for the position was essentially identical to the one employed during the first search, and Lam again applied, along with 87 other applicants. All of the members of the 1987–88 appointments committee were either unwilling or unable to serve again. The Dean asked two faculty members who had voted for Lam the first time to serve on the committee, but they declined. The appointments committee ultimately consisted of three white members of the faculty who did not support Lam in 1988 [7] (one was an untenured woman professor), along with two students of Asian ancestry.

Early in the 1989–90 academic year, the new appointments committee reviewed applications for a commercial law position. At one meeting, a male committee member stated that the Law School should not have two women teaching commercial law. This comment was reported to the Dean, who said that he recognized that the professor had difficulty dealing with women but took no action to remove him from the committee or otherwise to remedy the problem.[8]

When the appointments committee concluded its deliberations regarding the com-

---

**7.** Since faculty balloting during the first search was open and in the presence of the Dean, he would have been aware of faculty members' previous votes.

**8.** The woman law professor who spoke to the Dean about the male professor's comment testified that she believed the comment was seriously meant, and that the search was "seriously tainted" by the male professor's attitude toward

mercial law position, the chair distributed copies of the announcement for the PALS directorship and a brief description of the program to aid the committee in reviewing the applicants for the position. Besides these materials, guidance for the selection process was minimal: members of the committee independently selected the 15 to 20 candidates that they considered most promising and the committee list was compiled based on these separate lists. The chair, who had been on leave the previous semester, had not been informed by the Dean of the extensive discussions and developments that had taken place regarding selection procedures. None of the suggestions or recommendations of Professor Matsuda or of the EEO officers was employed. Despite all of the past debate over the possibility of discrimination and the need for careful selection procedures, no mechanism was put into place to screen out potential bias or retaliatory sentiments resulting from the prior search.

Lam did not appear on any of the committee member's lists, and neither Lam nor her application was ever discussed at any committee meetings. The final list of candidates that the committee recommended to the faculty consisted entirely or almost entirely of persons of United States origin, both white and non-white,[9] in contrast to the substantial number of non-whites and foreign-born candidates appearing on the list prepared by the previous appointments committee. The faculty met with six of the top candidates, three of whom had applied during the first search and been awarded lower ratings than Lam.[10]

The faculty voted to offer the PALS position to Alison Conner, a white Harvard Law graduate with a Ph.D in Chinese History who had substantial law teaching experience and several publications. Conner, however,

declined to accept the offer. Rather than make an offer to any of the other applicants, the faculty again cancelled the search.

## C.

Lam filed suit in May 1989 against the University of Hawai'i, the Dean of the Law School, and the President of the University, alleging discrimination on the basis of race, sex and national origin with regard to the 1987–88 search, as well as retaliation. Defendants moved for summary judgment in July 1990 and Lam amended her complaint to allege discrimination and retaliation during the second search. In response, defendants filed a motion for summary judgment regarding that search. The district court granted defendants' motion for summary judgment regarding the first search, but determined that there was a genuine issue of material fact as to whether the defendants intentionally discriminated against Lam, or retaliated against her, in connection with the 1989–90 search. After a bench trial, the district court entered judgment for the defendants as to the second search. Lam now appeals both rulings.

## II.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire ... any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). It also prohibits an employer from retaliating against an applicant for employment because the applicant has opposed any unlawful employment practice, or has made a charge, testified, assisted, or participated in an employment discrimina-

women applicants. She suggested that it was inappropriate to continue the application process with the committee as then constituted. The male professor did, however, eventually vote for the woman applicant who had prompted his comments.

**9.** The list was divided into tiers, with a first group of five candidates described as the most qualified, a second group of three candidates as

qualified, and then an "also ran" group. Of the thirteen people on the list, only one had a last name denoting non-European ancestry (his ancestry was never confirmed at trial but his resume indicates that he was born in Kansas), and only two were women.

**10.** The other three were first-time applicants.

tion investigation or proceeding. 42 U.S.C. § 2000e–3(a).

## A.

We turn first to Lam's appeal of the district court's grant of summary judgment as to the first search.

### 1.

A *prima facie* case of unlawful employment discrimination on the basis of protected characteristics may be established through indirect evidence under the familiar *McDonnell Douglas* four-part test. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In *McDonnell Douglas,* the Supreme Court held that the plaintiff can make out a *prima facie* case by showing that (1) she belongs to a protected class, (2) she applied for and was qualified for a job for which the employer was seeking applicants, (3) despite being qualified, she was rejected, and (4) after her rejection, the position remained open and the employer continued to seek applicants from people of comparable qualifications. 411 U.S. at 802, 93 S.Ct. at 1824.

■ After a *prima facie* case is established, "the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision.

Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994) (quoting *Lowe v. City of Monrovia,* 775 F.2d 998, 1005 (9th Cir. 1985), *as amended,* 784 F.2d 1407 (9th Cir. 1986)).[11]

■ On summary judgment, the existence of a discriminatory motive for the employment decision will generally be the principal question. To survive an employer's summary judgment motion, only a genuine factual issue with regard to discriminatory intent need be shown, a requirement that is almost always satisfied when the plaintiff's evidence, "direct or circumstantial, consists of more than the *McDonnell Douglas* presumption." *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir. 1991); *compare J.R. Simplot Co.,* 26 F.3d at 890 (summary judgment appropriate, after showing of a "bare *prima facie* case," where evidence to refute defendant's legitimate explanation is "totally lacking"). Because we find that Lam satisfied this requirement, we reverse the district court's grant of summary judgment to defendants.

### 2.

The district court found that Lam had established a *prima facie* case of discrimination under the four-part *McDonnell Douglas* test.[12] It then found that defendants had

---

11. Retaliation claims are included within this framework. *Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 504 n. 4 (9th Cir.1989); *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987). As noted in *Ruggles v. California Polytechnic State University,* 797 F.2d 782 (9th Cir.1986), "[r]etaliation is simply one sort of discrimination." *Id.* at 788 n. 1 (Nelson, J., concurring); *see* 42 U.S.C. § 2000e–3(a) (using term "discrimination" to describe retaliation). Most commonly, of course, we rely on the term discrimination as shorthand to describe discrimination on the basis of protected characteristics, while using the term retaliation to describe discrimination on account of an employee's, or potential employee's, opposition to an unlawful employment practice.

12. Since Lam, in her opposition to summary judgment in connection with the first search, focused on discrimination on the basis of protected characteristics rather than retaliation, the district court never specifically addressed the retaliation issue.

Since we conclude that Lam presented sufficient evidence of discriminatory bias to survive summary judgment, we need not rule on the adequacy of her asserted evidence of retaliation. We note, nonetheless, that the district court determined that most members of the faculty believed that Professor A. recused himself from the appointments committee because of Lam's opposition to him, and it found that some faculty members "were outraged that Professor A. had been asked to resign due to possible bias." It

met their burden of proffering legitimate reasons for not hiring Lam—specifically, Lam's lack of scholarship, and faculty disagreement regarding the desired characteristics of the PALS director—shifting the burden back to Lam to show the existence of a triable issue of fact.

■ Lam submitted evidence of discriminatory bias at two stages of the hiring process, with respect to at least two senior white male professors. Most significantly, Craven testified that Professor A., who headed the appointments committee for a month and disparaged Lam's abilities before the committee and the faculty as a whole, had a biased attitude toward women and Asians. Indeed, the district court specifically found that "the evidence suggests that Professor A. harbored prejudicial feelings towards Asians and women." There was also evidence that another white male professor had stated that, given Japanese cultural prejudices,[13] the PALS director should be male. This evidence is, as a matter of law, sufficient to preclude the award of summary judgment for defendants.

The district court articulated two reasons in support of its decision to grant summary judgment, the primary one being that any faculty prejudice that existed could not, in its view, be attributed to the named defendants in the action. Although the court acknowledged that members of the faculty "may very well have harbored prejudices against Asians and women in general, and against plaintiff in particular," it ruled that "without proof that the named defendants either shared those prejudices or conformed their conduct under influence of those prejudices, [the facts] are insufficient to support a showing of intentional discrimination by defendants."

Consistent with its focus on the individual defendants, the court found it crucial that the Dean asked Professor A. to resign as chair of the appointments committee.[14] As this undue emphasis on the Dean and corresponding disregard of the faculty members demonstrates, however, the court failed to give proper consideration to the nature of the university's hiring process.

The principal defendant in this case is the University, which has delegated to the faculty near-total control over hiring. The faculty, first in committee, then as a whole, reviews applications, chooses the final candidates, and votes on whether to extend any candidate an offer of employment. The hiring process is therefore not insulated from the illegitimate biases of faculty members. Indeed, since the faculty is small—only fifteen members—and great emphasis is placed on collegiality and consensus decisionmaking, even a single person's biases may be relatively influential. That is particularly true where, as here, that person plays a significant role in the selection process and leads the fight pro or con with respect to a particular candidate. See Gutzwiller v. Fenik, 860 F.2d 1317, 1327 (6th Cir.1988) (two biased faculty votes sufficient to establish discriminatory employment decision in tenure process that required decisions at four separate levels).

■ As other courts have recognized, discrimination at any stage of the academic hiring or promotion process may infect the ultimate employment decision. Roebuck v. Drexel Univ., 852 F.2d 715, 727 (3d Cir.1988). Accordingly, a plaintiff in a university discrimination case need not prove intentional discrimination at every stage of the decisionmaking process; impermissible bias at any

would certainly be possible to infer that those faculty members allowed their anger at Professor A.'s forced resignation to shade their consideration of Lam's application.

13. The existence of such third party preferences for discrimination does not, of course, justify discriminatory hiring practices. See, e.g., Diaz v. Pan Am. World Airways, 442 F.2d 385, 389 (5th Cir.1971) (holding that customer preference for female flight attendants does not constitute a

"bona fide occupational qualification" under Title VII); cf. C. Sunstein, Three Civil Rights Fallacies, 79 Cal.L.Rev. 751, 760–61 (1991) (economically "rational" discrimination has powerful reinforcing effect on ordinary prejudice).

14. The court stated that summary judgment for defendants would have been inappropriate had Professor A. been allowed to remain as chair.

point may be sufficient to sustain liability. *Id.; Fields v. Clark University*, 817 F.2d 931, 933–35 (1st Cir.1987) (where departmental recommendation important, evidence of sexist bias within sociology department sufficient to sustain liability under Title VII, even absent evidence of improper bias on the part of the ultimate deciding authority). Here, the purported bias allegedly had its ultimate impact at the faculty meeting stage.

■ Defendants argue, nonetheless, that they can only be held liable if it is shown that they "knew or in the exercise of reasonable care should have known" of Professor A.'s biased attitudes. They cite *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1515–16 (9th Cir.1989); *Ellison v. Brady*, 924 F.2d 872, 881 (9th Cir.1991), as mandating this rule. However, *Hacienda Hotel* and *Ellison* are both sexual harassment cases involving employer liability for the creation of a hostile work environment under the doctrine of respondeat superior. Limitations on liability appropriate in that context are wholly inapplicable to the discriminatory hiring context. As numerous cases involving discrimination in faculty hiring and promotion demonstrate, where a university has delegated employment decisions to a committee and members of that committee have allegedly engaged in discriminatory treatment, the university is liable.[15] *See, e.g., Ruggles*, 797 F.2d at 784; *Fields*, 817 F.2d at 932.

■ The district court's second justification for granting summary judgment was based on the defendants' favorable consideration of two other candidates for the PALS position: one an Asian man, the other a white woman. In assessing the significance of these candidates, the court seemed to view racism and sexism as separate and distinct elements amenable to almost mathematical treatment, so that evaluating discrimination against an Asian woman became a simple matter of performing two separate tasks: looking for racism "alone" and looking for sexism "alone," with Asian men and white women as the corresponding model victims. The court questioned Lam's claim of racism in light of the fact that the Dean had been interested in the late application of an Asian male.[16] Similarly, it concluded that the faculty's subsequent offer of employment to a white woman indicated a lack of gender bias.[17] We conclude that in relying on these facts as a basis for its summary judgment decision, the district court misconceived important legal principles.

■ To begin with, even the Law School's favorable treatment of other Asian women would not necessarily defeat Lam's claim at trial. *See Gutzwiller*, 860 F.2d at 1320–21 (tenure position denied one white female professor in favor of another). Certainly it could not do so at summary judgment, for such evidence creates at most a genuine dispute as to a material factual ques-

---

**15.** In their argument on this point, the defendants make no distinction between the University's liability and that of the Dean and President (who are both sued in their official capacities).

**16.** Aside from the difference in gender, it is significant that Lam and the Asian male candidate were of different national origins—Lam being Vietnamese–French, the male candidate, Chinese. Lam alleged not only race discrimination but also national origin discrimination, thereby raising this distinction as relevant under Title VII. Moreover, the particular geographical consciousness of the PALS program means that the distinction might be more salient than it otherwise might be.

**17.** The district court should have noted, besides the difference in race, the chronological consid-

erations that preclude reliance on this fact to defeat Lam's discrimination claim. The offer of employment to the female applicant was made long after Lam had complained of discrimination both publicly and by filing the present discrimination action. By that time, the Law School was on notice that its employment actions would be subject to scrutiny. Given the obvious incentive in such circumstances for an employer to take corrective action in an attempt to shield itself from liability, it is clear that nondiscriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely even be relevant as circumstantial evidence in favor of the employer. *Gonzales v. Police Dept. of San Jose*, 901 F.2d 758, 761–62 (9th Cir.1990).

tion.[18] At least equally significant is the error committed by the court in its separate treatment of race and sex discrimination. As other courts have recognized, where two bases for discrimination exist, they cannot be neatly reduced to distinct components. *See Jefferies*, 615 F.2d at 1032–34; *Graham v. Bendix Corp.*, 585 F.Supp. 1036, 1047 (N.D.Ind.1984); *Chambers v. Omaha Girls Club*, 629 F.Supp. 925, 946 n. 34 (D.Neb. 1986), *aff'd*, 834 F.2d 697 (8th Cir.1987).[19] Rather than aiding the decisional process, the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences.[20] *Cf. Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983) (black female not necessarily representative of interests of black males and white females). Like other subclasses under Title VII, Asian women are subject to a set of stereotypes and assumptions shared neither by Asian men nor by white women.[21] In consequence, they may be targeted for discrimination "even in the absence of discrimination against [Asian] men or white women." *Jefferies*, 615 F.2d at 1032 (discussing black women); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir.1987) (same). Accordingly, we agree with the *Jefferies* court that, when a plaintiff is claiming race *and* sex bias, it is necessary to determine whether the employer discriminates on the basis of that *combination* of factors, not just whether it discriminates against people of the same race or of the same sex. *Cf. Connecticut v. Teal*, 457 U.S. 440, 455, 102 S.Ct. 2525, 2535, 73 L.Ed.2d 130 (1982) ("Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired.").

3.

■ The defendants assert several additional arguments in support of the grant of summary judgment. First, citing *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir.1986), and *Garvey v. Dickinson College*, 763 F.Supp. 799, 801–02 (M.D.Pa.1991), they argue that Craven's testimony as to Professor A.'s biases was inadmissible because it concerned acts and comments on Professor A.'s part that were too remote in time or too attenuated from Lam's situation. Although the *Allis–Chalmers* court stated that acts "remote in time or place" may be excluded under Fed.R.Evid. 403, it affirmed the admission of evidence of long-term harassment of black workers because such evidence demonstrated a "persistent pattern" of racial hostility. 797 F.2d at 1423–24. The *Garvey* court affirmed the admissibility of evidence of discriminatory incidents that occurred within the plaintiff's department, while excluding such evidence from other departments. 763 F.Supp. at 802. Even

**18.** Since the district court is barred from weighing conflicting evidence in ruling on a motion for summary judgment, we need not decide if such evidence might be deemed relevant to, though not determinative of, a claim of race and sex discrimination. We note, nonetheless, that in *Jefferies v. Harris County Community Action Ass'n.*, 615 F.2d 1025 (5th Cir.1980), the Fifth Circuit held that evidence of nondiscriminatory treatment of black males and white females is wholly irrelevant to the question of discrimination against a black female plaintiff claiming bias on both racial and gender grounds. *Id.* at 1034. On the other hand, evidence of *discriminatory* treatment of, for example, a black male clearly is relevant to the discrimination claim of a black woman. *See, e.g., EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1072 (11th Cir.1990). We express no view on whether such a one-way bar is justified in either some or all cases.

**19.** In essence, the district court's approach reduces discrimination against Asian women to discrimination against Asian men plus discrimination against white women. The inherent fallacy of this approach is obvious when one considers that discrimination against white men could be similarly analyzed, using the same models: Asian men plus white women.

**20.** See K. Crenshaw, *Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscriminatory Doctrine, Feminist Theory and Antiracist Politics*, 1989 U.Chi.Legal F. 139; J. Winston, *Mirror, Mirror on the Wall: Title VII, Section 1981 and the Intersection of Race and Gender in the Civil Rights Act of 1990*, 79 Cal.L.Rev. 775 (1991).

**21.** *See, e.g.,* J. Hagedorn, *Asian Women in Film: No Joy, No Luck*, Ms., Jan./Feb. 1994, at 74 (listing stereotypes of Asian women such as geisha, dragon lady, concubine, lotus blossom).

read broadly, neither case is helpful to defendants. Craven testified not to remote acts but to a consistent pattern of behavior on the part of Professor A.—a member of the relevant department—with one manifestation of his alleged discriminatory attitude having occurred only a few months before the directorship search.

Next, defendants argue that *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), establishes a rule, triggered here, that if the factual context renders a plaintiff's claim implausible, she must come forward with more persuasive evidence to support her claim than would otherwise be necessary. *See id.* at 587, 106 S.Ct. at 1356. They argue that because Professor A.'s alleged ethnic and gender biases would amount to professional suicide in today's politically correct academic climate, Lam's charges "simply make[ ] no economic sense," *id.*, thus justifying this more demanding evidentiary burden. Specifically, they cite to the lack of corroboration of Craven's testimony as to Professor A., insisting on other evidence of his bias. We find defendants' reliance on *Matsushita* to be misplaced.

The rule established in *Matsushita* pertains only to the plausibility of inferences drawn from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir.1988). *Matsushita* does not, therefore, affect our consideration of Craven's allegations—which we accept as true for purposes of summary judgment—even if it would require us to question implausible inferences therefrom.

◼◼◼◼ Moreover, while in antidiscrimination cases as in other areas of law, a plaintiff bears a heavier evidentiary burden if the factual context renders his claim implausible, *see Morales v. Merit System Protection Board*, 932 F.2d 800, 802–03 (9th Cir. 1991), Lam's charges are by no means implausible. The fact that adverse economic consequences may flow from an alleged act of employment discrimination does not render the allegation implausible. Antidiscrimination laws are not predicated upon the existence of economically "rational" discrimination; the problem that exists and which such laws target is, to a large extent, stubborn but irrational prejudice. Thus, we cannot say that Lam's charges are "implausible" simply because the discriminatory actions might have an adverse economic impact on Professor A. or the University. *Cf. Sischo–Nownejad*, 934 F.2d at 1110 n.10 (finding no circumstances rendering Title VII claim implausible).[22] Nor are we persuaded by the University's assertion that Lam's claims are implausible in the present academic climate because acts that have even the appearance of bias would constitute professional suicide. To accept the University's argument would be to create a presumption that acts of academic employment discrimination are implausible and that the *Matsushita* burden applies to all such cases. This presumption is patently contrary to fact and we squarely reject it. There is no question that acts of bias and discrimination occur in university hirings today. The process of rooting out discrimination against women and minorities on our nation's faculties is far from ended.

Finally, not only is the point of defendants' argument that "charges of bias should not be made lightly," somewhat elusive, but the cases they cite, which concern recusal of administrative law judges and other impartial arbitrators in judicial and administrative hearings, are inapposite.[23] ALJs and judges are presumed to be impartial in their deci-

**22.** In *McLaughlin*, we emphasized the *Matsushita* rule's particular relevance to antitrust conspiracy cases (*see* 849 F.2d at 1207), though we note that courts have applied Matsushita's reasoning to other contexts in which economic rationality might safely be presumed. *See, e.g., Knight v. Sharif*, 875 F.2d 516, 523 (5th Cir.1989) (breach of contract); *In re Fortune Sys. Sec. Litigation*, 680 F.Supp. 1360, 1368 (N.D.Cal.1987) (securi-

ties fraud). Title VII, by contrast, applies to a very different kind of motivation, so that such cases are inapposite.

**23.** *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826–27, 106 S.Ct. 1580, 1588, 89 L.Ed.2d 823 (1986); *McLaughlin v. Union Oil Co. of California*, 869 F.2d 1039, 1047 (7th Cir.1989); *Glass v.*

sions. A member of a faculty appointments committee is, in contrast, likely to be personally interested in the outcome of the process.

#### 4.

As we have previously explained, "[w]e require very little evidence to survive summary judgment" in a discrimination case, "because the ultimate question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the factfinder, upon a full record." *Sischo–Nownejad,* 934 F.2d at 1111. Besides an overall more particularized factual inquiry, a trial provides insight into motive, a critical issue in discrimination cases. The existence of an intent to discriminate may be difficult to discern in depositions compiled for purposes of summary judgment, yet it may later be revealed in the face-to-face encounter of a full trial.

The university setting—in which, as in this case, employment decisions are made by a group, and collegiality and personal relationships are often significant factors—presents an especially difficult one in which to evaluate allegations of discrimination. As with all group decisionmaking, a complex of motives may exist. Personal animus, factional infighting and politics may influence and even determine certain faculty employment decisions, and are legally permissible if not praiseworthy bases for such decisions. Without a full factual inquiry, however, it may be extremely difficult to distinguish these types of permissible, though relatively personal, motivations from unlawful ones. Accordingly, although for purposes of this appeal we have considered the evidence in the light most favorable to Lam, because the district court granted summary judgment for defendants, we express no view on the reasons underlying the faculty's decision to cancel the first search. Instead, we necessarily reserve

*Pfeffer,* 849 F.2d 1261, 1268 (10th Cir.1988); *Maier v. Orr,* 758 F.2d 1578, 1583 (Fed.Cir.1985).

**24.** Section 107 of the Civil Rights Act of 1991 modified the rule of *Price Waterhouse.* In cases in which § 107 applies, the employer is liable

the resolution of all factual issues to the district court following a full presentation of the evidence.

#### B.

We turn next to Lam's appeal of the final judgment regarding discrimination and retaliation in the second search.

#### 1.

■ We review the district court's findings of fact under the "clearly erroneous" standard. *Muntin v. State of Cal. Parks & Recreation Dept.,* 738 F.2d 1054, 1055 (9th Cir.1984). Legal conclusions are reviewed de novo. *Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 503 (9th Cir.1989), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990).

■ Under Title VII the ultimate burden of persuading the trier of fact that the employer intentionally discriminated "'remains at all times with the plaintiff.'" *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)); *see also United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). However, under the rule enunciated in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion), an employer who is proven to have discriminated can still avoid liability by showing by a preponderance of the evidence that "the employment decision would have been the same even if [discrimination] had played no role." *Sischo–Nownejad,* 934 F.2d at 1110 (citing *Price Waterhouse,* 490 U.S. at 243–47, 109 S.Ct. at 1786–89).[24] The burden is on the employer to make this showing as

once the plaintiff shows that a protected characteristic played a motivating part in the employment decision (the employer's proof that the same employment decision would have been made in the absence of the impermissible motive goes only to the issue of relief). *See* 42 U.S.C.

an affirmative defense. *Price Waterhouse,* 490 U.S. at 246, 109 S.Ct. at 1788.[25]

### 2.

In its findings of fact and conclusions of law, the district court first determined that Lam had established a prima facie case of discrimination and retaliation. It then found that "[s]ome members of the faculty and administration resented Lam's actions and one committee member had difficulty dealing with women." It did not, however, conclude that discrimination or retaliation played a motivating factor in the Law School's failure to hire Lam. Instead, it held that the discriminatory and retaliatory animus was not causally linked to either the selection of appointments committee members or the decision of the appointments committee not to submit Lam's name to the faculty. The court also noted that there was no "concerted action" among committee members to keep her name off each of their lists.

In addition, the court found that subjective hiring criteria were unevenly applied. Nonetheless, it concluded that this was due to faculty uncertainty regarding the desired goals and attributes of the PALS program and the unorganized and inefficient search conducted by the Law School, rather than to discrimination or retaliation. Likewise, the court concluded that the Dean's inquiry regarding whether one candidate's application was weaker than Lam's did not evidence prohibited motivations but instead reflected concern over the Law School's legal difficulties with Lam.[26]

The court ultimately determined that Lam would not have been hired by the Law School, "even given a well-organized and thorough search procedure," because the members of the appointments committee had each determined that she was less qualified than the candidates they recommended. Accordingly, the court ruled that Lam failed to prove a violation of Title VII.

### 3.

Lam alleges four principal errors in the district court's ruling. First, she claims that the court erred by "inventing a non-discriminatory reason" for the defendants' failure to hire Lam. Second, she claims that the proffered reason is insufficient as a matter of law. Third, she claims that the court improperly required that Lam show "concerted action" to retaliate. Fourth, she claims that the court misapplied the applicable legal standards.

■ Lam's first and second arguments pertain to her contention that the district court improperly supplied the rationale that disorganization was the legitimate nondiscriminatory reason for the decision not to hire Lam in the second search. For two reasons, however, these arguments must fail. First, although the district court found that the search was disorganized, it attributed the ultimate decision not to appoint Lam to the search committee's lawful determination that her qualifications were weaker than those of the candidates it recommended. The court's discussion of disorganization was included simply to explain the uneven application of

§§ 2000e-2(m) & 2000e-5(g)(2)(B)(i). Lam argues that § 107 is applicable here, but we need not decide this issue in light of our holding that Lam did not prove that discrimination or retaliation was a motivating factor in the Law School's decision not to appoint her.

**25.** As the Court explained in *Price Waterhouse,* the rule that the burden shifts to the employer to prove this affirmative defense does not affect the rule that the plaintiff retains the burden of persuasion regarding discrimination, since these burdens involve two separate and not inconsistent propositions. 490 U.S. at 246 n. 11, 109 S.Ct. at 1788 n. 11.

**26.** In her brief, Lam states that "the Dean admitted, and [Professor K.] agreed, that Lam was more qualified than a white male finalist in the second search." However, that professor testified only that she "agreed with [the Dean] that [the white male finalist's] file was less strong than *Alison Conner's,*" not Lam's. Although Professor K. was critical of both finalists' qualifications, she never compared their qualifications with Lam's. Similarly, although Professor K. stated that the Dean expressed concern that that finalist's file might be weaker than Lam's, she did not say that the Dean in fact believed that the finalist's file was weaker.

hiring criteria, which Lam had asserted was evidence of discrimination. Second, *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), precludes Lam's argument. In *Hicks*, the Supreme Court held that, once the employer has met its initial burden of production, the district court may rule in its favor on the basis of any facts in the record supporting its position, even though the court may entirely disbelieve the employer's proffered rationale. *Id.* at —— – ——, 113 S.Ct. at 2755–56. In any event, here the court did rely on the nondiscriminatory reason advanced by the defendants, and that reason was clearly sufficient as a matter of law.

Lam also argues that the district court improperly required that concerted action among committee members be shown. Lam is of course correct in asserting that there is no requirement under Title VII of concerted action to discriminate or retaliate. In the present case, however, the court simply noted the absence of concerted action as relevant to his conclusion that each committee member independently found Lam insufficiently qualified to merit inclusion as a finalist; there is no indication that the court thought that concerted action was required.

■ Lam's fourth argument for reversal is that the district court misapplied the relevant legal standards. In her view, there was

sufficient evidence of discrimination and retaliation to trigger the burden-shifting requirement of *Price Waterhouse*. Therefore, Lam contends, the district court erred by failing to require the defendants to show that they would not have appointed her even in the absence of the discriminatory and retaliatory motives.

It is true that the district court here recited the *Price Waterhouse* burden-shifting rule in its opinion. It is also true that the court failed to shift the burden to the defendants. Because, however, the burden shifts only when the court finds that unlawful discrimination played a part in the employment decision, and because here the court clearly found that impermissible motives were not a factor in the decision, the court had no reason to apply the *Price Waterhouse* rule. Even though Lam presented strong circumstantial evidence of discrimination and retaliation, she did not, in the court's view, show that it is more likely than not that discrimination or retaliation " 'played a motivating part in [the] employment decision.' " *Sischo–Nownejad*, 934 F.2d at 1110 (quoting *Price Waterhouse*, 490 U.S. at 244, 109 S.Ct. at 1787). Upon a review of the record, we cannot say that this finding is clearly erroneous.[27]

### III.

We therefore reverse the district court's award of summary judgment for the defen-

---

27. Lam presented a variety of evidence in support of her allegations of bias. Most obviously, Lam's absence from every one of the selection lists of the appointments committee members was suspect in light of her strong showing in the first search. Moreover, non-white and foreign-born candidates were conspicuously missing from the final list of candidates prepared in the second search, in contrast to the more diverse origins of candidates considered during the first search.

Additionally, the defendants failed to institute any of the procedural reforms suggested in the aftermath of Lam's original allegations. As we have previously explained, although an employer's violation of its own hiring policies does not constitute a *prima facie* violation of Title VII, it may be circumstantial evidence of discrimination. *Gonzales*, 901 F.2d at 761; *compare Jackson v. Harvard Univ.*, 900 F.2d 464, 465 (1st Cir.) (affirming district court finding of no discrimination in light of "exacting protocol" of tenure decision process, including "prescribed stan-

dards" by which to measure candidates), *cert. denied*, 498 U.S. 848, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990)).

Lam also showed evidence that one search committee member was reluctant to hire a woman commercial law professor, although that member did in fact vote in favor of offering the position to a woman.

Finally, Lam presented substantial evidence that, given the Law School's "collegial" atmosphere and corresponding emphasis on consensus, the notoriety of her protest against the school's alleged discrimination was likely to affect her chances of being offered a position there. Certain professors testified that the Dean and the President were strongly opposed to hiring Lam, and that this opposition was known to the Law School faculty. (In her brief, Lam asserts that "two search committee members considered her [oppositional] activities in rejecting her application," implying that their view of her activities affected their consideration of her application. However, of the two professors cited, one was not on the second search committee, and the

dants as to the first search and remand for further proceedings, but affirm the decision granting final judgment for the defendants as to the second search. The fact that we find no clear error in the district court's findings of fact in connection with the second search does not affect our decision to remand for trial as to the first search. In its decision regarding the second search, the court did not itself find Lam objectively less qualified than the other candidates: it simply found that the search committee members had come to that conclusion and that it was lawful for them to do so. The court did not conclude, moreover, that it would have been unreasonable for the committee members to have chosen Lam, nor did it conclude that the faculty would have failed to select her had she been recommended. In the first search, of course, the members of the search committee *did* find Lam sufficiently qualified to merit consideration by the full faculty.[28] Her name was included in the final list of four recommended candidates. On the basis of the record before us, we cannot say that absent the alleged bias the faculty would have failed to select Lam for the PALS directorship following the first search.

REVERSED in part and AFFIRMED in part.

other stated that his view of Lam's activities would not have affected his judgment on the merits of her application.)

Accordingly, the court's assertion that "no evidence has been adduced to point even to an inference of discriminatory or retaliatory motives on the part of the second search committee members in the selection of recommended candidates" (Finding of Fact and Conclusions of Law, at 14) is clearly erroneous. The above-described circumstantial evidence certainly supports an *inference* of discriminatory/retaliatory intent. It does not, however, necessitate the conclusion that the defendants' failure to appoint Lam was based on impermissible motivations. As we have emphasized, it often requires a searching factual inquiry to ascertain the motivations for a hiring decision, a difficult task that is exacerbated when multiple decisionmakers are involved. Here, over the course of a five-day bench trial, the district court heard testimony from a variety of sources, including Lam, each of the members of the search committee, various Law School faculty members, and the Dean. The search committee members uniformly stated that their decisions were not motivated by impermissible bias; the court, assessing their credibility and exercising its judgment, chose to believe them. We cannot say that the court clearly erred in doing so.

28. We note, in addition, that substantial evidence was adduced regarding faculty uncertainty as to the goals of the PALS program and the desirable attributes of its director. In particular, there was a good deal of debate in the faculty regarding whether a "public law" or "private law" emphasis was preferable. As a result, therefore, of the two years intervening between the first and second searches, Lam may have appeared a less attractive candidate to the 1989–90 search committee members.