Linda ANTHONY, Plaintiff,

v.

COUNTY OF SACRAMENTO, et al., Defendants.

No. CIV. S–93–1974 LKK.

United States District Court, E.D. California.

Sept. 1, 1995.

Gary William Gorski, Whitfield and Gorski, Rancho Cordova, CA, for plaintiff.

Nancy Joan Sheehan, Porter Scott Weiberg Delehant, Sacramento, CA, for all other defendants.

Nancy Joan Sheehan, Porter Scott Weiberg Delehant, Sacramento, CA, Daniel Scott Glass, Lea and Arruti, Sacramento, CA, for Mike Jones.

## ORDER

KARLTON, Chief Judge Emeritus.

Plaintiff, a former sheriff's deputy, is an African–American woman who alleges racial and sexual harassment on the job. The complaint originally named the county Sheriff's Department, Sheriff Glen Craig, two of plaintiff's former supervisors and eleven other co-workers as defendants. This matter is before me on defendants' motion for summary judgment. In response to the instant motion, plaintiff abandoned her claims against all individuals except the Sheriff and accordingly those individuals have been dismissed as parties.

I will dispose of the pending motion in two separate orders. In this opinion, which will be published, I explain why that portion of defendants' motion directed towards plaintiff's hostile work environment claim brought pursuant to Title VII, and the portion directed towards plaintiff's claim brought against the county pursuant to § 1983, must both be

denied. In the unpublished order the court disposes of the balance of the motion.[1]

## I.

### FACTS

Plaintiff was originally hired by the Department as a dispatcher in 1987. She began training as a deputy sheriff in January, 1988. She spent six months at the training academy, which she found to be a pervasively racist environment. Racial slurs were commonly used. For example, during a training session a white instructor told a group of black trainees that he was "the head nigger in charge." Plaintiff and another African–American woman report being singled out for harsh treatment and excessive scrutiny by instructors, and subjected to "negative peer pressure" and disrespect from white trainees.

In June, 1988, plaintiff was assigned to the Rio Cosumnes Correctional Center. There she overheard white officers referring to her as a "black bitch." On one occasion plaintiff was ordered to subdue an African–American inmate. Plaintiff alleges that the inmate had been provoked with racial slurs, that she was then sent in to "get this big black nigger out of here before [the white officer] kick[s] his ass," and that officers later joked about the fact that plaintiff had been sent in alone to handle a dangerous situation. On another occasion, Deputy Ziegler told plaintiff to transport an inmate he referred to as a "fucking nigger." Training officer Osborne discussed this incident with plaintiff. Ziegler acknowledges using the racial slur and insists that he apologized; plaintiff states that he did not apologize.

A flyer was circulated anonymously and posted on the bulletin board in the jail which referred to African–Americans as "niggers" and "baboons." On one occasion while walking past a guard tower, plaintiff was bombarded with oranges. On another occasion she observed the truck of a black male deputy covered with toilet paper.

Plaintiff alleges that during 1988 Deputy Don Folk bragged about beating up black inmates, boasting once in her presence that he had "fucked up another nigger." Plaintiff's deposition testimony is that Folk took "before and after" photographs of inmates he abused, carried these in a special portfolio,

and showed them to her on at least one occasion. She also testifies that she observed Folk taking African–American inmates from their cells to interrogation rooms to photograph and beat them, but that she was afraid to report this conduct because of her probationary status. She testifies that training officer Smith was aware of Folk's conduct, and told her that it was inappropriate but should be ignored. Folk denies these accusations.

In January, 1989, plaintiff was transferred to the main jail. There she often heard officers refer to inmates as "niggers" and "nappy heads." Plaintiff identifies several offensive incidents which took place between 1989 and 1991. A white female officer made a derogatory reference to departmental recruitment in Del Paso Heights, a largely African–American neighborhood. During a training session on weapons searches, Deputy Rose ran his hands through plaintiff's hair to demonstrate a search technique. In an unrelated briefing session, Lieutenant Mahan asked plaintiff about African–American hairstyles in front of approximately 75 other officers. At another briefing, a white male deputy demanded that plaintiff give up her seat, said "she's acting dumb like all of them do," threatened to "piss on her," and kicked her chair. Other white male deputies watched and laughed.

Beginning in 1991, plaintiff became an outspoken critic of the verbal and physical abuse which she claims was regularly visited upon African–American inmates by law enforcement personnel at both jails. Her complaint identifies several officers, some of whom were initially named as defendants, as having mistreated black prisoners. When she was assigned to the medical unit, medical staff sought her assistance in putting an end to the use of excessive force. Plaintiff kept notes of the abuse she witnessed, and reported it to Lt. Mahan in or around November, 1991. Lt. Mahan initiated an investigation, which concluded that the allegations were unfounded. Plaintiff subsequently experienced an escalation in hostility from co-workers, which she attributes to her efforts to stop the abuse of inmates.

---

1. I have previously explained my reasons for such a procedure where there is justification for publication of the disposition of only some of the questions tendered by a motion raising multiple issues. *See Kouba v. Allstate Insurance Co.* 523 F.Supp. 148, 151 n. 2 (E.D.Cal.1981).

In January, 1992, Deputy Jones (the officer who had previously kicked plaintiff's chair) anonymously circulated an altered newspaper article regarding a shooting at a local restaurant. The article had been defaced with racial commentary identifying the white gunman as a "model citizen" and the black victims as "fucked up," "nappy-headed," and "tree-swinging." Another employee showed the article to plaintiff, and she brought it to the attention of supervisory officers. Jones was subsequently identified as the responsible party, and he received a letter of reprimand.

A newspaper left on another desk in plaintiff's workplace was altered to show a target on the forehead of an African–American inmate. That April, an article entitled "Why Cops Hate You" was left on plaintiff's desk. In August, racist graffiti in the men's locker room was the subject of discussion among officers and was addressed at a briefing. The graffiti disparaged the "Nigger Deputy Sheriff's Association," commenting: "A mind is a terrible thing to waste. It's too bad niggers didn't get one." The responsible parties were never identified.

In October, 1992, plaintiff found that the number on her radio had been altered to read "666," which she interpreted as a biblical reference to the devil. In November, plaintiff found a flyer in her mailbox that read: "Warning, I can go from 0 to Bitch in 1.1 seconds!" An empty bottle of Premsyn PMS, an over-the-counter medication used to relieve the symptoms of premenstrual syndrome, was also left anonymously in her mailbox. This incident closely followed a dispute between plaintiff and three white officers over booking procedures, in which she was accused of creating unsafe conditions and told that "fucking day watch liberals" were responsible for problems in the department. Plaintiff construed the reference to "liberals" to include people of color. Plaintiff had asked a supervisor to address the dispute, and was later cursed and called a snitch.

Plaintiff was acutely distressed by receipt of the flyer and medication bottle. She demanded an investigation, but the responsible party was never identified. Plaintiff took two days off for stress, and on return she requested transfer from booking to the jail

kitchen. There she came into conflict with the civilian kitchen staff regarding operating procedures and respective powers and duties. Plaintiff attributes the disrespect for her authority primarily to gender bias, but also to race.

On February 8, 1993, there was a verbal confrontation between plaintiff and cook Czekaj in which the cook challenged plaintiff's authority. Czekaj yelled and cursed at plaintiff while pointing his finger in her face, in front of inmates. Plaintiff discussed the incident with her supervisor, Sgt. Scheuring, the following day. Czekaj was verbally reprimanded by his own supervisor. On February 15, 1993, plaintiff again requested reassignment. An assignment satisfactory to plaintiff was not offered. Plaintiff never returned to work.

On February 17, 1993, plaintiff's union representative informed Sgt. Yoshida of Internal Affairs ("IA") that plaintiff had a possible harassment complaint. Sgt. Yoshida relayed this information to Chief Carol Daly, the Commander of the Administrative Division. Plaintiff was initially reluctant to discuss her claims, but submitted an extensive written grievance on February 24, 1993. Chief Daly ordered an IA investigation, which was conducted by Sgt. Risedorph.

On April 26, 1993, Risedorph submitted his factual findings to Capt. McKee. On the basis of these findings, McKee made a written recommendation that the majority of plaintiff's claims be found not sustained or unfounded. Eight of thirty allegations were deemed sustained, and as to each of these McKee concluded that appropriate action had already been taken or that no offender had been identified. These recommendations were passed up the chain of command. Sheriff Craig issued the final determination on June 18, 1993, adopting McKee's recommendations.

Plaintiff filed a charge of discrimination with the Department of Fair Employment and Housing ("DFEH") on June 17, 1993, and with the Equal Employment Opportunity Commission ("EEOC") on July 9, 1993. She obtained a right to sue letter, and commenced this action on December 16, 1993, alleging both federal and state causes of action. Defendants seek summary judgement as to each of them.[2]

2. The standards for disposition of motions for summary judgment are well known, and thus I

do not set them out here. *See e.g., Clark v. Kizer,* 758 F.Supp. 572, 574–75 (E.D.Cal.1990).

## II.

### *PLAINTIFF'S TITLE VII CLAIMS*

Plaintiff seeks to hold the county, her former employer, liable for racial and sexual harassment and retaliation in violation of Title VII.[3] In support of their motion for summary judgment, defendants first pose a threshold challenge to the viability of plaintiff's claims.

#### A. Scope of Plaintiff's EEOC Charge

The county argues that most of plaintiff's case is barred because it exceeds the scope of her EEOC charge. The formal charge, which was prepared by the EEOC for plaintiff's signature, reads "I have been subjected to racial and sexual harassment since at least September 1, 1992 and continuing until February 1, 1993. I believe I have been discriminated against because of my race (Black) and my sex (female) in violation of the Civil Rights Acts of 1964, as amended." [4]

■ Two distinct questions are presented regarding the scope of the charge. The first is chronological: the county argues that plaintiff is barred from basing her claims on events prior to September 1, 1992. The second involves the theories of discrimination fairly supported by the administrative complaint.

■ As a general rule, the scope of an EEOC charge defines the scope of administrative exhaustion and thus the scope of the permissible claim. *Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir.1990). Incidents and theories of recovery not encompassed in the charges are only actionable if "like or reasonably related to" the charge. *Id; Serpe v. Four–Phase Systems, Inc.,* 718 F.2d 935, 937 (9th Cir.1983); *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 899 (9th Cir.1994). The test is whether an investigation of the original charge, liberally construed, would have encompassed the additional matters. *Sosa,* 920 F.2d at 1456–57.

■ Here, the formal charge prepared by the agency[5] covers incidents beginning "at least" in September, 1992. The administrative complaint on which the charge was based specifically alleged a history of discriminatory practices spanning plaintiff's employment.[6] Use of the phrase "at least" suggests a potentially broader time frame. This language, taken together with the narrative plaintiff submitted in support of her complaint, provides a reasonable basis for EEOC investigation of related acts before September, 1992. Accordingly, I conclude that incidents of alleged race and sex harassment predating the chronological scope of the charge may be pursued in this action.

■ The county cites *Ong v. Cleland,* 642 F.2d 316 (9th Cir.1981), for the proposition that plaintiff cannot pursue a pattern or practice claim when such was not included in the EEOC charge. This argument is inapposite, as plaintiff is not bringing a pattern and practice suit for classwide relief, *see Hazelwood School Dist v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). To the extent the defendant means to argue that plaintiff's failure to administratively charge a continuing violation precludes that theory here, the argument is not well taken.

■ In *Ong,* plaintiff's EEOC charge alleged a single failure to promote, which was found not to be "like or reasonably related to" subsequent constructive discharge or pattern and practice claims. *Ong,* 642 F.2d at 319–20. Constructive discharge is a distinct adverse employment action from failure to promote, and pattern and practice claims are class-wide rather than individual in nature. *See id.* Here, plaintiff's administrative charge involves hostile environment harassment, which by its nature involves an ongoing course of conduct rather than a single discrete act. Claims of harassment, pattern and practice, and continuing violations are sufficiently similar in nature and reasonably related on their facts to implicate each other for purposes of defining the scope of a Title VII action. *Sosa,* 920 F.2d at 1457. Defendants' argument therefore fails.

---

3. This claim is not stated against the Sheriff. *See Miller v. Maxwell's Int'l. Inc.,* 991 F.2d 583, 587–88 (9th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994) (no individual liability under Title VII).

4. Defendants' Exhibit TT.

5. The agency's charge substantially condenses and edits plaintiff's complaint. It is the complainant's theory, not the agency's drafting, which is dispositive. *See EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 899 (9th Cir.1994).

6. Defendants' Exhibit SS.

Finally, plaintiff's formal EEOC charge does not allege retaliation. Plaintiff did explicitly include retaliation claims in her complaint to the agency, however, and alleged that the sexual and racial harassment she experienced were inflicted for retaliatory reasons.[7] In determining the scope of administrative exhaustion, well established Ninth Circuit law requires me to construe plaintiff's EEOC charge "with the utmost liberality." *Kaplan v. International Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1359 (9th Cir.1975); *see also Chung v. Pomona Valley Community Hosp.*, 667 F.2d 788, 790 (9th Cir.1982). The question is whether the additional claim fell within the scope of the EEOC's actual investigation or an investigation which could reasonably have been expected to grow out of the charge of discrimination. *Sosa*, 920 F.2d at 1456.

An additional claim comes within the scope of a reasonable EEOC investigation when it is part of the same alleged discriminatory scheme and is necessary to an understanding of plaintiff's original theory of the case. *EEOC v. Farmer Bros.*, 31 F.3d at 899. Plaintiff's explication of her employment history made to the EEOC is the same as the theory of her case here: that she was harassed on the combined grounds of her own race and sex and in racist retaliation for her defense of inmates. Accordingly, an investigation based on plaintiff's EEOC file would encompass the question whether the alleged harassment was in part retaliatory, and the retaliation claim is not barred. *Id; see also Sosa*, 920 F.2d at 1457 (claim of retaliation for opposition to discrimination reasonably related to racial discrimination claim).

## B. Evidence of Continuing Violation

The county next seeks summary judgment on the grounds that plaintiff's claims are largely time-barred. The claims are based on an alleged course of conduct spanning plaintiff's employment with the Sheriff's Department, from 1988 through February, 1993. I have previously ruled that the complaint adequately pleaded a continuing violation sufficient to save the claims from dismissal on statute of limitations grounds. *See Anthony v. County of Sacramento*, 845 F.Supp. 1396, 1402–03 (E.D.Cal. 1994). The question at this stage is whether plaintiff has adduced sufficient evidence of a continuing violation to proceed to trial.

A continuing violation may be established either by demonstrating a department-wide discriminatory system or by demonstrating a series of related acts against the individual. *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1480 (9th Cir.1989). Plaintiff's discrimination theory is a hybrid, combining acts directed at her personally with evidence of an environment generally hostile to African–Americans and women.[8] Because no formal policy or specific employment practice is alleged to be discriminatory, the first type of continuing violation theory is not applicable. *See Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir.1982), *cert. denied* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). The question thus becomes whether the events plaintiff claims injured her (1) are closely enough related to constitute a continuing violation, and (2) do not individually constitute discrete and completed acts of discrimination. *See Green*, 883 F.2d at 1480–81.[9]

---

7. Defendants' Exhibit SS.

8. As explained more fully below, such a theory supports recovery for a hostile work environment under Title VII. *See Woods v. Graphic Communications*, 925 F.2d 1195, 1202 (9th Cir.1991).

9. *Green*, a disparate treatment case, states that the related acts must be "against a single individual." *Green*, 883 F.2d at 1480. This does not establish a requirement that, in a hostile environment case, only acts specifically directed at the plaintiff are cognizable. The relatedness inquiry must be tailored to the nature of the violation alleged to be continuing.

In *Green*, liability turned exclusively on defendant's direct mistreatment of the individual. *See Green*, 883 F.2d at 1481. In the hostile environment context, there is no substantive requirement that all conduct contributing to the violation be directed specifically or exclusively at the plaintiff. *Woods*, 925 F.2d at 1202. Rather, conduct is actionable when it affects the conditions of plaintiff's employment. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). Ac-

The county argues that plaintiff suffered "discrete acts of discrimination," rather than a continuing violation, because she knew she had been injured at the time of each event.[10] The continuing violation doctrine does not apply to completed acts of discrimination such as discharge. *Grimes v. City and County of San Francisco*, 951 F.2d 236, 238 (9th Cir.1991); *Green*, 883 F.2d at 1481.[11] Rather, it applies to a pattern of acts which do not individually violate rights but cumulatively rise to the level of actionable conduct. *See Rodgers v. County of Yolo*, 889 F.Supp. 1284 (E.D.Cal.1995). Accordingly, the question is not whether the acts individually caused injury, but whether that injury was individually sufficient to give rise to a cause of action.

Plaintiff's subjective experience of injury in response to the use of a racial epithet or a personal slight does not give rise to a separate cause of action. On the contrary, it is well established that individual expressions of bias which do not affect employment status do not violate Title VII. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). The hostile environment theory, under which plaintiff proceeds, recognizes that when such acts are repeated and pervasive they may nonetheless collectively alter the conditions of employment. *See Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991) (incidents which are not individually severe but occur frequently may cumulatively violate Title VII). Accordingly, contrary to defendants' contention, the statute of limitations cannot run individually from each subjective experience of injury.

The county also contends that the various incidents cannot be considered closely relat-ed because the racial and gender-based incidents, considered separately, are not sufficiently numerous. It maintains that the race and gender allegations posit distinct violations of Title VII which must independently satisfy the relatedness and continuity test. Defendant's position is contrary to a significant recent development in employment law.

The Ninth Circuit now recognizes combined race and sex discrimination claims under Title VII. *Lam v. University of Hawaii*, 40 F.3d 1551, 1561–62 (9th Cir.1994). Where a woman of color alleges that she has been subject to discrimination on the combined bases of her race and gender, it is error for the court to analyze sex and race separately. *Id.* Rather, the proper inquiry is whether the employer discriminated on the basis of the combined factors. *Id.* at 1562.[12] In this case, plaintiff's allegations plainly implicate a *Lam* theory of discrimination.

Plaintiff complains of certain incidents which were offensive on racial grounds and others which targeted her as a female, and still others in which she was mistreated as an African–American female. In the latter category of incidents, it is impossible to separate racial and sexual hostility. For example, the epithet "black bitch" cannot be designated exclusively as either racist or sexist. Moreover, plaintiff appears to argue that racial hostility in the Department was particularly virulent against female deputies, and that sexual bias was particularly directed at African–American women. Overall, plaintiff's theory is that she was subjected to an environment that was hostile on both racial and sexual grounds, and that she was harassed to a degree that altered the conditions of her employment because she was a black wom-

cordingly, the relatedness inquiry in the case at bar must address acts which took place in the plaintiff's immediate workplace, thus potentially injuring her in violation of Title VII. *See Woods*, 925 F.2d at 1202.

10. In her deposition, plaintiff repeatedly states that she experienced emotional pain each time she heard a law enforcement officer use the word "nigger," witnessed inmate abuse, or was ostracized by a colleague.

11. When a discrete act violates the statute in and of itself, the cause of action accrues immediately and the statute of limitations is accordingly triggered. The fact that such an act may also be part of a wider pattern of discrimination does not toll the statute as to the discrete violation. *See Grimes, supra.*

12. With *Lam*, the Ninth Circuit joins the Fifth and Tenth Circuits in recognizing combined claims. *See Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025 (5th Cir.1980);

an.[13] I must therefore consider the evidence of racial and sexual animus collectively for purposes of assessing plaintiff's continuing violation theory. *See Lam,* 40 F.3d at 1562.

Plaintiff complains of events spanning a five-year period and involving a large number of individual perpetrators, the majority of whom are personally implicated in a single incident and several of whom are unidentified.[14] These factors do not, defendants' argument to the contrary notwithstanding, compel a finding of nonrelatedness. Plaintiff's central claims involve workplace conditions. The fact that a large number of individuals in the workplace participated in racist and sexist conduct supports, rather than undermining, such a claim.

Plaintiff has produced evidence that expressions of racial and gender hostility were ongoing and accepted at the training academy, Rio Cosumnes Correctional Center, and the main jail during her assignments there. (Evidence of conduct that did not involve plaintiff or conditions in her immediate workplace is immaterial and has been disregarded.[15]) She has tendered testimony that the use of racial and sexual slurs was ubiquitous, and that less frequent but more serious incidents involving racist cartoons and flyers, graffiti, and altered newspaper articles were recurrent. She has also presented evidence that African–American inmates were abused with impunity, and that she was personally ostracized and mistreated by co-workers and supervisors.

The county disputes that the racist and sexist speech independently rises to the level of a Title VII violation, that the inmate abuse occurred at all, and that the conflicts with co-workers were motivated by impermissible bias. On summary judgment, however, the court is obligated to believe the nonmoving parties evidence, *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986), and draw all inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Under those standards the events plaintiff relies on convey the uniform message that women and blacks are unequal, unwelcome, and potentially endangered within the department. Because the various incidents are thus related by theme, motive, and target, they must be considered as a single pattern of harassment. While the offensive behavior ebbed and flowed in severity, plaintiff's evidence supports a conclusion that it continued as a single pattern throughout the period at issue. Accordingly, the

---

*Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir.1987).

**13.** Although *Lam* itself was a disparate treatment case, the same analysis applies to hostile environment claims. *See Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir.1987) (in determining pervasiveness of harassment, court may aggregate evidence of racial and sexual hostility). While disparate treatment and hostile environment claims challenge distinct forms of employer misconduct, they address the same underlying forms of impermissible discrimination. *See Lam,* 40 F.3d at 1562 (*citing Hicks* with approval).

**14.** The county argues that plaintiff has conceded its version of facts regarding the eleven dismissed defendants, and that her own deposition testimony and other evidence regarding their conduct is therefore inadmissible. The contention is not well taken. First, the dismissal of those defendants rendered moot those portions of the moving papers specifically directed to the claims against them as individuals. Accordingly, plaintiff's failure to formally dispute (or acknowledge as undisputed) the factual assertions regarding those claims cannot be construed as a judicial admission. Second, because there has been no entry of partial judgment, there has been

no final determination which could arguably have preclusive effect as to those claims and the facts underlying them. *See* Fed.R.Civ.P. 54(b).

On summary judgment, the court must consider all relevant admissible evidence. Facts regarding the conduct of individual employees may be relevant to municipal liability, regardless of whether they would support recovery from the individuals. In the matter at bar plaintiff's evidence is admissible insofar as it provides an evidentiary foundation for liability on the part of the remaining defendants.

**15.** Evidence of conduct which was directed at plaintiff, occurred in her presence, or affected *conditions in her workplace* is relevant to a continuing violation of plaintiff's right to be free of an abusive work environment. Plaintiff's evidence regarding racism and sexism in the department generally, such as testimony by former employees about racist jokes they heard and racist events that took place in areas where plaintiff was not assigned, are not relevant to this inquiry, although such evidence is relevant to the issue of the employer's knowledge and duty to correct. The evidence has been considered on those issues.

county is not entitled to summary judgment on statute of limitations grounds.

### C. Proof of Racial and Sexual Hostile Environment

■ The county seeks summary judgment on the grounds that plaintiff's evidence of a Title VII violation is insufficient to put to a jury. It argues first that plaintiff fails to meet the evidentiary standards for a pattern and practice claim. As I have already explained, such a claim is not before me. This argument which characterizes the offensive conduct as mere "sporadic incidents" and "stray remarks," may be viewed as a challenge the sufficiency of evidence of a hostile environment. I therefore turn to that issue. As explained above, plaintiff's evidence of racial and sexual harassment must be considered together for this purpose. *Lam,* 40 F.3d at 1561; *Hicks,* 833 F.2d at 1416.

■ To violate Title VII, harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986) (*quoting Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)).[16] Whether conduct is sufficiently severe and pervasive to permit recovery is a mixed question of law and fact. *Jordan v. Clark,* 847 F.2d 1368, 1375 n. 7 (9th Cir.1988), *cert. denied* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989). The totality of the circumstances must be considered. *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982); *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1394 (8th Cir.1983), *cert. denied* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984).

■ It is the harassment which must be pervasive or severe, not the alteration in the conditions of employment. *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991). That is, there is no requirement that the harassment cause tangible economic loss or debilitating psychological injury. *Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404; *Ellison,* 924 F.2d at 878. Rather, a work environment violates Title VII when it is both subjectively and objectively abusive in its own right. *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

■ In this circuit, objective hostility is determined from the perspective of a reasonable person with the same fundamental characteristics as plaintiff. *See Ellison,* 924 F.2d at 879 (adopting a "reasonable woman" standard); *Nichols v. Frank,* 42 F.3d 503, 511–12 (9th Cir.1994) (objective standard considers standpoint of reasonable person with accuser's defining traits, including race, sex, age, disability, and sexual orientation). Accordingly, in assessing plaintiff's evidence, the question is whether a reasonable African–American woman would have considered the conduct sufficiently severe and pervasive to alter the conditions of employment and create an abusive work environment.

■ Plaintiff produces evidence of a virtually unbroken stream of hostility during her five years with the department. The least severe form of harassment, the use of racial and sexist epithets, was also the most frequent. While the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" is not, by itself, actionable under Title VII, *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (1986) (*quoting Rogers, supra*), persistent subjection to racial or sexual derogation can alter the conditions of employment. *Woods v. Graphic Communications,* 925 F.2d 1195, 1202 (9th Cir.1991).

■ Plaintiff has testified that the use of racial slurs and sexual insults was ubiquitous at the training academy, the Rio Cosumnes Correctional Center ("RCCC"), and the main jail.[17] Other witnesses have corroborated this testimony as to particular work sites.[18] Where such conduct is frequent the

---

16. The standards for racial and sexual harassment are the same. *Meritor,* in which the Supreme Court held that sexual harassment is a form of gender discrimination, borrowed the analytical framework of *Rogers,* a race-based hostile environment case.

17. The most frequently used epithets include "nigger," "nappy head," "bitch," and "cunt."

18. *See e.g.* Adams Decl. (training academy); Robinson Dep. at 15–16 (main jail). For the reasons previously explained, I have disregarded testimony about the use of racial epithets and other

individual remarks cannot be dismissed as "stray."[19] It is immaterial that the insults were not directed at plaintiff personally in every instance, but were used to refer to other black officers, African–American civilians, and inmates. When a worker is surrounded by racial hostility, even when only a few incidents are directed at her personally, she may recover on a hostile environment theory. *Woods*, 925 F.2d at 1202.

The offensive conduct in this case was not limited to use of derogatory epithets. When racial or sexual slurs are combined with racist cartoons, graffiti, practical jokes, and physical intimidation or threats, a hostile environment may be created. *See id.* at 1197–98, 1202; *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1515 (9th Cir.1989). Plaintiff has tendered evidence that racist flyers were circulated in the jail and posted on bulletin boards, that calendars and newspapers were altered with racist comments and drawings, and that racist graffiti appeared in the workplace.[20] Such deliberate acts of hostility convey a direct message that black colleagues are unwelcome and considered unequal, and thus constitute more severe acts of harassment than the incidental use of racial epithets.

The most severe form of racism is racist violence, and plaintiff has tendered evidence that African–American inmates were regularly subject to physical abuse in her workplace.[21] Defendants have protested throughout this litigation that the treatment of inmates is irrelevant to plaintiff's claims of harassment. I cannot agree. The racially motivated or race-specific abuse of inmates creates a climate of racial hostility in the workplace that can significantly affect the conditions of employment. It is well-established that discrimination against non-employees can pollute a work environment in violation of Title VII. *See Rogers*, 454 F.2d at 237–38.[22] Plaintiff's evidence that African–American inmates were subject to excessive force thus directly supports her claim that she, as an African–American, felt not

expressions of racism outside of plaintiff's assigned work sites for the purpose of determining whether she had been subjected to an abusive work environment.

19. The county's characterization of the verbal harassment as "stray remarks" without evidentiary significance misses the mark. In the disparate treatment context, mere "stray remarks" are insufficient to establish discrimination. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438–39 (9th Cir.1990). That is, discriminatory remarks unrelated to a particular employment decision are inadequate circumstantial evidence, without more, to support an inference that the decision itself was motivated by impermissible considerations. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–52, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989).

In the hostile environment context, the evidentiary issue regarding racist and sexist comments is a different one. The question is not whether discriminatory attitudes evidenced by a remark may be attributed to other conduct, but whether the offensive conduct as a whole, including the offensive remarks, renders the workplace abusive.

20. The county urges the court to disregard evidence of the racist graffiti that appeared in the men's locker room of the main jail, because plaintiff did not personally observe it. The question is not whether plaintiff directly perceived the graffiti, but whether her work environment was altered. The graffiti at issue was a racist attack on the Black Deputy Sheriff's Association, of which plaintiff was an active member. The graffiti was discussed among jail personnel. A jury could conclude that its presence affected the conditions in which plaintiff worked. *See* Robinson Dep. at 16–17.

21. Plaintiff's deposition includes testimony about several specific incidents of abuse, names numerous victims and perpetrators, and reports conversations with jail medical staff in which doctors and nurses confided their concerns to plaintiff. *See* Plaintiff Dep. at 277–80, 286–88, 291–93. Plaintiff's testimony regarding conversations between medical staff and supervisory personnel appears to be inadmissible hearsay which was not considered in disposition of this motion. Her testimony regarding medical staff's reports to her are admissible not as to the truth of the underlying abuse allegations, but as to the racial climate in the jail, the basis for her complaints to Lt. Mahan, and the adequacy of the department's response. Plaintiff's testimony regarding her personal interactions with injured prisoners is admissible regarding both her state of mind and the truth of the abuse allegations.

22. In *Rogers*, the ground-breaking hostile environment case on which the Supreme Court relied in *Meritor*, the plaintiff was a Hispanic employee who complained that her employer segregated Hispanic clients. The court found that such discrimination against the employer's clientele could impermissibly taint the work environment and support a cause of action on the part of the employee. *Rogers*, 454 F.2d at 237–38.

only unwelcome but endangered in the workplace.[23]

It is true that the evidence of physical abuse is more sporadic than that involving less severe manifestations of racial hostility.[24] The number or frequency of these incidents, however, is not determinative. *Woods*, 925 F.2d at 1201. It is well established that severity may offset frequency on the one hand, and less severe incidents may collectively permit recovery when they "pollute" the work environment with racial or sexual tension. *See id.* at 1201–02; *Ellison*, 924 F.2d at 878 (noting inverse relationship between severity and pervasiveness). Because the existence of a hostile environment turns on the totality of the circumstances, the more severe incidents may not be wrested from their context and deemed "isolated." *See Gilbert*, 722 F.2d at 1394.

Plaintiff has produced evidence of an ongoing pattern of racial insults punctuated by less frequent but more serious incidents. While either category standing alone might be insufficient to constitute an abusive environment, taken together they could support a jury finding of objective hostility. *See id.* The evidence of hostile acts specifically targeting plaintiff must also be viewed within this evidentiary context. Plaintiff has tendered evidence that on various occasions she was treated with overt hostility and disrespect by white co-workers.[25] While the asserted racial and/or gender basis for these incidents is sometimes obscure, and inference

of bias would not be unreasonable.[26] A jury could conclude from this evidence and the surrounding circumstances that plaintiff was subjected to workplace conditions that denied her right to be free of discrimination and, because of the law enforcement context, potentially threatened her safety.[27]

Because plaintiff has produced evidence of both (1) frequent but less severe expressions of racial and sexual hostility and (2) occasional but more severe abusive conduct, the totality cannot be deemed insufficient as a matter of law to alter the conditions of employment. Accordingly, I conclude that there is a triable issue as to the existence of a hostile work environment.

### D. Employer's Remedial Action

The county next contends that they are entitled to summary judgment because appropriate remedial action was taken regarding those incidents which were brought to the department's attentions. Title VII imposes upon employers a duty to prevent and remedy abusive workplace conditions. The obligation to take remedial action arises when management level employees know or have reason to know of the conduct. *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir.1995). Failure to remedy results in liability for the harassment; adequate remedial action shields the employer from liability. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994),

**23.** Where concern for safety and individual rights turns on race, an officer of color may well feel unable to trust her colleagues' concern for her own safety. The use of excessive force against black inmates, incidents in which plaintiff perceived that she was personally put at risk for sport (such as being ordered to single-handedly subdue a dangerous inmate who had been deliberately provoked), and the general unwillingness of white coworkers to respect her authority (such as the booking and kitchen conflicts), if believed by a jury, would collectively support a conclusion that plaintiff was potentially endangered by the prejudices in her workplace.

**24.** Plaintiff alleges that such abuse was ongoing and that rumors of excessive force were chronic. Her direct evidence focuses on the time periods in and around 1988, when she witnessed Deputy Folk's deliberate documentation of inmate abuse, and 1991, when she was assigned to the medical unit.

**25.** The chair-kicking at briefing, booking conflict with deputies Vlahos, Reinl and Parkhurst, and confrontation with cook Cekaj, all previously described, are paradigmatic of the incidents for which plaintiff presents evidence on this motion.

**26.** For example, the deputy who kicked plaintiff's chair and threatened to "piss on her" was the same individual who later was identified as the source of a racist flyer circulated in the jail. The booking and kitchen incidents do not contain internal indicia of racial or gender bias (plaintiff's interpretation of the reference to "day watch liberals" as racially specific is strained), but the surrounding conditions of racial and gender tension support such an inference. The closeness in time of the booking dispute, bitch flyer, and receipt of the PMS bottle support an inference of relatedness.

**27.** *See* n. 22, *supra.*

cert. denied, —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Ellison,* 924 F.2d at 881.

Defendant directs the court to evidence of disciplinary action which was taken in specific instances. For example, Deputy Jones received a written reprimand for distribution of the annotated newspaper article, and cook Czekaj received an oral reprimand for challenging plaintiff's authority in front of inmates. Whether these responses were reasonably calculated to put an end to the conduct is incapable of determination on the record before the court. *See Ellison,* 924 F.2d at 882 (adequacy of remedial action is measured by reasonableness standard). In both examples cited here, the offender had prior confrontations with plaintiff, and there is no evidence that defendants attempted to discern whether the incidents were isolated or illustrative of a larger problem. Given the scope of plaintiff's evidence of a hostile environment, a reasonable jury might conclude that these efforts were insufficient.

 More importantly, however, the responses to isolated incidents do not discharge the county's obligation to remedy a wider pattern of harassment of which management-level employees knew or should have known. *See Fuller,* 47 F.3d at 1529. Plaintiff's failure to formally complain about each incident does not obviate defendants' duty to take action where the exercise of reasonable care would have brought the misconduct to light. *See Ellison,* 924 F.2d at 881. Plaintiff has tendered evidence that numerous incidents of racist harassment were perpetrated or witnessed by training officers and supervisors.[28] On other occasions she reported misconduct to superiors.[29] General concerns about racism in the department, including schisms among personnel and the mistreatment of inmates, were formally and informally presented to the Sheriff by the Black Deputy Sheriff's Association and individual officers.[30]

 A jury could conclude from this evidence that management knew or should have known about the overall hostile conditions complained of here. Defendant has tendered no evidence of efforts to remedy those conditions, arguing instead that the county cannot guarantee an ideal workplace immune from broader social tensions. That is of course true, but beside the point. When general social problems manifest themselves in the workplace to a degree that alters the conditions of employment, Title VII imposes an affirmative duty to remediate. Because I have concluded that there exists a triable issue as to the existence of a hostile environment, defendants may not prevail on the argument that no duty to remedy arose.

On the issue of inmate abuse, defendant points to the fact that Lt. Mahan ordered investigation of plaintiff's complaints and determined them to be unfounded. This conclusion is not entitled to deference, however. *See Fuller,* 47 F.3d at 1529. The evidence before the court does not establish that the investigation was adequate or its conclusions correct. Indeed, plaintiff's evidence regarding the use of excessive force and complaints by medical staff[31] raise serious questions whether management should have taken more vigorous investigative and remedial action.

In a similar vein, defendant relies on the ultimate Internal Affairs ("IA") investigation of plaintiff's charges, which concluded that adequate action regarding the few incidents which were deemed substantiated had already been taken. That conclusion, however, does not defeat the existence of a triable issue as to the merits of plaintiff's claims, the adequacy of prior remedial action, or the adequacy of their subsequent investigation. *See Fuller,* 47 F.3d at 1529 (IA conclusion that no harassment occurred does not satisfy remedial obligation). Plaintiff has identified evidence that several key witnesses she identified were never contacted by IA. This is sufficient to raise a triable issue as to the adequacy of the investigation, and thus the adequacy of defendants' remedial action. *Id.*

Accordingly, for all the reasons explained above, the county is not entitled to summary

---

**28.** *See e.g.* Plaintiff Dep. at 76, 135–36, 142, 158.

**29.** *See e.g.* Plaintiff Dep. at 129–30, 288, 424–28.

**30.** Plaintiff Dep. at 177–80; Turner Dep. at 19–20; Meeks–Harris Dep. at 25–26, 31–33, 43–44; Carter Dep. at 37–38.

**31.** *See* Plaintiff Dep. at 277–80, 286–88, 291–93.

judgment on plaintiff's hostile environment claim.

## III.

### COUNTY LIABILITY UNDER 42 U.S.C. § 1983

Plaintiff brings her constitutional tort claim against the county asserting that defendants are liable for the violation of her rights under the 5th, 13th, 14th, and 15th Amendments. In essence, plaintiff's § 1983 claim recharacterizes the harassment discussed above in Title VII terms as a violation of her right to equal protection. *See Roberts v. College of the Desert,* 870 F.2d 1411, 1415 (9th Cir.1988) (Title VII does not preempt § 1983 claims based on discrimination in public employment). The county seeks summary judgment on several alternative grounds, which I address *seriatim.*

### A. Timeliness of Claims

 The county argues first that the claim is time-barred. The continuing violation doctrine applies to claims under 42 U.S.C. § 1983. *Green,* 883 F.2d at 1480. Accordingly, the analysis set forth *supra* regarding Title VII applies equally in this context. Thus defendant is not entitled to summary judgment on statute of limitations grounds.

### B. County Liability—Custom or Policy

 Section 1983 requires a claimant to prove (1) that a person acting under color of state law (2) committed an act that deprived her of some right, privilege, or immunity protected by the Constitution or federal law. *Leer v. Murphy,* 844 F.2d 628, 632–33 (9th Cir.1988). Counties and their law enforcement departments are "persons" within the meaning of the statute. *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978); *Shaw v. State of California Dept*

*of Alcoholic Beverage Control,* 788 F.2d 600, 604 (9th Cir.1986). A person deprives another of a federal right within the meaning of § 1983 if "he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Leer,* 844 F.2d at 633 (*quoting Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978)).

 Counties are not vicariously liable for deprivations caused by their employees. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036 (no respondeat superior liability under § 1983). Rather, municipal entities are subject to liability where "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Id.* A direct causal link between departmental policy or custom and the alleged deprivation is therefore required. *See City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d 412 (1989).

 Plaintiff may establish municipal liability in three alternative ways. *See generally Gillette v. Delmore,* 979 F.2d 1342 (9th Cir.1992), *cert. denied* —— U.S. ——, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993). First, she may prove that the violation was committed pursuant to a formal departmental policy or a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2724, 105 L.Ed.2d 598 (1989). Second, she may prove that the individual who committed the tort was an official with final decision-making authority. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986).[32] Finally, she may prove that an official with final decision-making authority ratified a subordinate's action and its basis. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Only the first theory of liability is presented by the facts of this case.[33]

---

32. The conduct of such high-ranking officials may be attributed to the county. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Liability established in this way is not vicarious, but recognizes that the county exercises its own governmental functions through its policy makers. County liability arises

when those governmental acts are themselves unconstitutional.

33. Sheriff Craig is sued both personally and in his official capacity. In the latter form the suit is simply an alternative way of suing the county. There is no evidence that Sheriff Craig, who has final decision-making authority regarding the

The Ninth Circuit has explained that custom requires proof of more than "random acts or isolated events." *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443–44 (9th Cir.1989). Rather there must be proof of a "permanent and well settled practice ... [which] although not authorized by written ... or express municipal policy ... constitute[s] ... usage with the force of law." *Id.* Upon such a showing, however, liability can be imposed "irrespective of whether official policy makers had actual knowledge of the practice at issue." *Id.*

Plaintiff has tendered evidence supporting a conclusion that racist and sexist harassment, and the mistreatment of inmates, are pervasive and well-settled practices in the department. The deposition testimony of Deputies Robinson, Barnsdale, and Turner, former Deputy Adams, Lts. Meeks–Harris and Carter, Capt. Doonan, and civilian employees Hudnall and Williams corroborate various aspects of plaintiff's testimony regarding conditions in her work sites, and present additional evidence that the disputed practices were endemic to the department above and beyond those particular locations and time frames. That supplemental evidence, while irrelevant to the merits of plaintiff's claims, is nonetheless admissible on the broader question of custom which underlies potential county liability.[34]

The department relies on its formal non-discrimination policy, but it is well-established that the routine failure to follow a general policy can itself constitute an actionable custom. *Redman v. County of San Diego*, 942 F.2d 1435, 1445 (9th Cir.1991) (en banc), *cert. denied* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Despite the existence of the formal policy, plaintiff has identified numerous incidents of race and sex harassment which went unpunished. The lack of appropriate discipline is evidence of custom. *Gillette*, 979 F.2d at 1349. While defendant argues that in some cases the perpetrators were unknown, it cannot be determined on this motion whether those incidents were adequately investigated. Failure to properly investigate, like failure to discipline, supports a finding that harassment was not only accepted but customary within the meaning of *Monell*. *See id.*

Moreover, although defendants plead ignorance of the ongoing violations, the very extent and openness of racist and sexist behavior supports an inference that managerial level employees had at least constructive knowledge. *See Rodgers v. County of Yolo*, 889 F.Supp. 1284 (E.D.Cal.1995). Plaintiff has tendered evidence that her superiors regularly witnessed the low-level manifestations of racism and had indirect knowledge of more severe abuses.[35] Other African–American officers repeatedly presented their concerns on these issues to the Sheriff.[36] Accordingly, the defense of ignorance is unpersuasive.

The county argues that plaintiff's custom or practice theory is precluded by her deposition testimony and earlier statements to the media that the Sheriff does not condone racism and that the problem was not department-wide. First, plaintiff's arguably inconsistent statements go to her credibility, which may not be considered on this motion. Second, her personal assessments of moral or political responsibility are irrelevant to the legal conclusion whether there has been a

---

Department's internal affairs, personally committed any of the offensive conduct. The second theory is therefore inapplicable. Although plaintiff argues that Craig "ratified" racism in his department, she presents no evidentiary foundation for recovery on this basis.

To prevail on a "ratification" or "acquiescence" theory, plaintiff must prove that the Sheriff affirmatively approved the particular conduct at issue. *See Gillette*, 979 F.2d at 1348. This requires contemporaneous knowledge of the conduct and a deliberate choice to endorse it rather than an alternative. *Id.; see also Pembaur*, 475 U.S. at 477, 106 S.Ct. at 1297. There is no such evidence here. Even if plaintiff is correct that

Craig's overall approach to intra-departmental race relations contributed generally to the alleged racist climate, this does not constitute a deliberate policy choice attributable to the county under *Pembaur*.

**34.** Indeed, the failure to admit evidence of other acts which would support the existence of a custom may be reversible error. *See e.g. Fletcher v. O'Donnell*, 867 F.2d 791 (3d Cir.1989), *cert. denied* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 591 (1989).

**35.** *See* n. 26 & n. 27, *supra.*

**36.** *See* n. 28, *supra.*

constitutional violation. A triable issue is created by plaintiff's evidence of a well-settled practice, and is not negated by the existence of inconsistent evidence. Summary judgment, in short, is not cross-examination. Just as a plaintiff may not manufacture a triable issue by self-contradiction, *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975), defendant may not obscure one by pointing to an alleged inconsistency in the evidence. The fact that evidence and inferences are available to support either position confirms the need for a trier of fact to resolve the question.

Defendants contend that there are practical limits to managerial oversight of interpersonal dynamics. While those arguments are not without persuasive force, the evidence tendered hardly conclusively resolves the question of the existence of an unconstitutional practice or custom. Accordingly plaintiff's evidence creates a triable issue sufficient to preclude summary judgment.

### *ORDER*

Accordingly, for the reasons stated above, it is hereby ordered as follows:

The county's motion for summary judgment is DENIED as to the claims arising under 42 U.S.C. § 1983 and under Title VII alleging a hostile work environment.

IT IS SO ORDERED.