Marcea **VANDERMEER** and Frances Macias, Plaintiffs,

v.

**DOUGLAS COUNTY, East Fork Fire District, and East Fork Paramedic District, Defendants.**

No. CV–N–97–172–ECR(PHA).

United States District Court,
D. Nevada.

July 15, 1998.

Mark Mausert, Reno, NV, Loren Graham, Stateline, NV, for Plaintiffs.

Stephen C. Balkenbush, Thorndal, Backus, Armstrong & Balkenbush, Reno, NV, for Defendants.

### ORDER

EDWARD C. REED, Jr., District Judge.

Currently before the Court is defendants' motion for summary judgment (# 12), filed March 12, 1998. Plaintiffs filed their opposition (# 15) on April 15, 1998, and defendants filed their reply (# 17) on May 13, 1998. The motion is now ripe. For the reasons set forth below, the motion (# 12) is hereby DENIED in part and GRANTED in part.

### BACKGROUND

Marcea Vandermeer and Frances Macias (collectively, "Plaintiffs") bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"), as well as the Civil Rights Act of 1871, 42 U.S.C. § 1983, and state law. Both plaintiffs were employed by defendant

East Fork Paramedic District[1]; the immediate supervisor of both women was Deputy Chief Robert Don Stangle ("Stangle"). Both women have accused Stangle of sexually harassing them, as well as other women in the office. While Plaintiff Macias is still employed by the Districts, Plaintiff Vandermeer was fired from her position in May of 1996. Shortly after Vandermeer's termination, the plaintiffs complained to the Douglas County D.A.'s office, which initiated an investigation into Stangle's conduct. Within months, Stangle "retired" from the District, allegedly under pressure from the County. Since his retirement, he has been collecting a disability pension of $2500 a month from the Nevada Public Employees Retirement System. Additional facts will be set forth below where relevant to the plaintiffs' various claims.

### DISCUSSION

**I. Summary Judgment Standard**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994) The moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed.R.Civ.P. 56(c); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 516

1. Although as set forth in the caption of this case the East Fork Paramedic District appears to be a separate entity from the East Fork Fire District, the evidence in the record suggests that the two districts are somehow connected. The districts were originally at least nominally separate—the Fire District was created in 1980 as the East Fork Fire Protection District, and the Paramedic District was created in 1986 as the Douglas County Paramedic Ambulance District. Then in 1990 or 1991 the districts apparently merged (although the record is not entirely clear on this point), becoming, collectively, the East Fork Fire and Paramedic Districts. It appears that, for the most part, the districts continued to have separate staffs, although both districts were run by

the Fire Chief, and certain operations may have been combined. Everyone involved in this case seems to refer interchangeably to "the Districts," "the District," "the Fire District," and several other variations. As no one has claimed that there is any need to differentiate between the two districts, we have assumed for purposes of this motion that "the East Fork Fire and Paramedic Districts" is one defendant, not two. For convenience, we will usually refer to "the Districts" in discussing either or both the Fire or Paramedic Districts. We do note, however, that the major players in this case—that is, both plaintiffs and their supervisor, Deputy Chief Stangle—were employed by the Paramedic half of the East Fork Fire and Paramedic Districts.

U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.*

## II. Plaintiffs' Title VII Claims

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...." 42 U.S.C. § 2000e–2(a). Implicit in this definition, of course, is that the employer charged with discrimination must be the *plaintiff's* employer in order for the plaintiff to be able to prevail. The defendants thus claim that Douglas County was never the employer of either plaintiff, and thus cannot be held liable for any harassment the plaintiffs might have been subjected to by Deputy Chief Stangle. Plaintiffs, naturally, contest this claim.

### A. Douglas County's Status As the Plaintiffs' Employer

Title VII defines an "employer" as "a person engaged in industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ...." 42 U.S.C. § 2000e(b). "Person" is defined to include "governments, governmental agencies, [and] political subdivisions," 42 U.S.C. § 2000e(a), so the defendants clearly can be employers within the meaning of the statute—as long as they have the requisite number of employees. However, the defendants have not argued that any of the defendants had fewer than 15 employees during the relevant period. Nor has any evidence been presented as to the number of employees employed by any of the defendants. Thus for purposes of this motion, at least, we will treat all of the defendants as falling within the statutory definition of "employer" under Title VII.

■ However, while it is clear that all the defendants are "employers," it is not so clear that the defendants were *plaintiffs'* employers. As defendants point out, the Fire and Paramedic Districts are, under Nevada law, separate and distinct political subdivisions of the state. *See* NRS 474.540 ("The activities of each district organized in accordance with NRS 474.460 shall be separate and apart from county activities and any other political subdivision of this state."). For purposes of the instant motion, at least, defendants have conceded that the Districts may be considered the plaintiffs' employer, but they assert that Douglas County may not be.

■ Plaintiffs argue, however, that the Districts are so connected to Douglas County that Douglas County is properly a defendant. In determining whether two or more nominally separate entities should be treated as one employer for purposes of Title VII, the

Ninth Circuit uses the four-part test initially adopted by the NLRB in labor cases. *Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1213 (9th Cir.1989). The factors to be considered in making this determination are: "(1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control." *Herman v. United Broth. of Carpenters & Joiners of Am., Local Union No. 971*, 60 F.3d 1375, 1383 (9th Cir.1995). The fact that Nevada may consider Douglas County and the Districts to be separate political subdivisions, while relevant, does not control.[2]

### 1. Interrelation of Operations

As to the first of the four factors listed above, the plaintiffs have presented significant evidence. They also point to evidence that has been presented by the defendants. The evidence presented includes the deposition testimony of both plaintiffs, as well as that of the two main defense witnesses, Stangle and Fire Chief Jim Reinhardt, Stangle's superior and head of the Districts. Both sides have submitted copies of various personnel forms, including the forms used to process defendant Stangle's retirement, plaintiff Vandermeer's termination, and plaintiff Macias' annual evaluations. The forms relating to both Stangle and Vandermeer are clearly marked "Douglas County Personnel Action Form." Both forms have a blank in which to indicate the subject employee's "Department," and on both Stangle's and Vandermeer's forms the response was "Paramedics." Vandermeer's form was signed by one Beverly Glenn, who, according to Stangle's testimony, was a member of the Douglas County Human Resources Department. The various forms used in connection with plaintiff Macias' annual evaluations also indicate some County involvement. Several forms include a section entitled "County Behaviors," on which Macias was evaluated. Another common section is entitled "Essential Job Functions/County Projects (Performance Responsibilities)." Macias' "Depart-

ment" is indicated as the East Fork Fire and Paramedic Districts. The forms usually bear the file stamp of either the "Douglas County Personnel Department" or "Human Resources."

When asked at his deposition to explain why Douglas County personnel forms were used for District employees, Stangle essentially stated that it was just more convenient to use the existing forms, and that using a separate District form would be redundant. In addition, the following exchange took place, which is somewhat illuminating as to how the relationship between the County and the Districts was regarded by employees:

Q. So, if the fire district had its own stationary, why was it using county stationary to terminate Marcea Vandermeer?

A. Because the County personnel department had the proper forms, had the proper stationary and the process was we received the advice of the human resources department or personnel department to make sure that we processed the paperwork properly. That was their function, is [sic] to aid us in making sure whatever step [sic] we took from the human resources point of view was properly followed, and that's why, that's why we advised, we received advice from them and we used the document.

Q. Now, this termination document, this bears the signature of your signature [sic] and Beverly Glenn's signature?

A. Works for the human resources department.

Q. And that's the human resources department in the County?

A. That's correct.

Q. Why is Beverly Glenn, why is there a line on this form for her signature if it's used for a district employee?

A. Because the personnel and human resources department of the County helped us process our employee related actions.

**2.** We also note that Douglas County could be considered the plaintiffs' employer if the Districts are considered an "agent" of the County, since the definition of employer includes "any agent of

such a person." However, the parties have not addressed this theory, so we do not discuss it here.

Q. Was her signature necessary for this termination to go through?

A. No.

Q. Then—

A. Not that I know of. I mean—

Q. Then why did she sign, just for fun; what was the reason she signed the document?

A. Because we generated the document from her office.

Q. Okay. Well, I mean I understand you had copies, you're using the County, the County documents?

A. But the human resources department of the County again aided us in personnel related matters. They didn't make the final decision, but they aided us in personnel matters.

Q. How did they aid?

A. Giving us advice, making sure whatever we were doing was legal. I'm not a human resources expert, there's nobody in the fire district that is. That department was and we worked together with them.

Q. Did you take that advice seriously?

A. Yes, we did.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Is it your understanding that's why [Beverly Glenn] signed?

A. It's my belief that she signed it because the human resources department aided us in human resources related issues, and that's the process, we processed our paperwork through them. Same, and the same response to why we use them for hiring and firing, they had a process that we knew was—let me put it into context for you, maybe this will help you clearly understand. I am not an attorney, I don't go out and make legal decisions, especially serious legal decisions without consulting an attorney, that's why we do that.

For that same reason, I go to the human resources department to say what do we need to do about this particular situation, how do we handle it, this is what we do, this is the process we do, this is the process we take, this is the paper work we use.

Stangle Dep. at 91–94. This language indicates that, regardless of whether the Districts theoretically had the power to make personnel decisions independently of the County, in practice such matters were handled in full cooperation with the human resources department, which appears to have been functionally integrated into the handling of the Districts' personnel actions.

In addition to the personnel forms, the policy on sexual harassment which was posted in the Districts' offices was issued by the County Manager under the heading "Douglas County Administrative Policies and Procedures." Section II of the policy, "Personnel Affected," indicates that "[a]ll County personnel" are covered. The memo states that Douglas County will not tolerate sexual harassment "during business involving the County, or while on County premises by any employee . . . ." Employees with complaints under the policy are directed to the Director of Personnel, the District Attorney, or the County Manager. Updates to the policy were sent to "All County Employees" by the Chairman of the Board of County Commissioners. No distinction of any kind is made for District employees.

On the other hand, the defendants point to the fact that the Districts occupied separate office space from other County operations, and had different telephone numbers. This is certainly relevant information—but not dispositive. Many large organizations occupy space in more than one location, and have different telephone numbers for different divisions or departments, yet are unquestionably one, single, employer. Thus while we have considered these facts, they are not sufficient to outweigh the evidence presented by the plaintiffs, so on balance we find that this factor weighs in favor of the plaintiffs' position, at least at this stage of the case.

### 2. Common Management

As to the second factor, it is quite clear that this factor tips in the plaintiffs' favor. The Districts and the County are both governed by boards of commissioners. Nominally, at least, the County is run by the Board of County Commissioners of Douglas County, and the Fire District is run by the

Board of Fire Commissioners. But the membership of the two Boards is identical. The Board of County Commissioners, in creating the Fire District by ordinance in 1980, declared itself to *be* the Board of Fire Commissioners, albeit in an ex-officio capacity. Douglas Co. Ord. No. 371. Likewise the Chairman of the Board of County Commissioners serves as the ex-officio Chairman of the Board of Fire Commissioners, the County Clerk as ex-officio Clerk of the Fire District, the County Treasurer as ex-officio Treasurer of the Fire District, and the Douglas County District Attorney as ex-officio attorney for the Fire District. *Id.* While such overlap of management-level officials alone would not necessarily preclude a finding that the County and the Districts are separate employers, it is more than enough to raise a question of common management sufficient to survive summary judgment.

### 3. Labor Relations

█ The third factor, "centralized control of labor relations," is usually regarded as the most important factor. While Defendants argue strenuously that Stangle had the authority to make all personnel decisions within the Paramedic District, subject only to the possible control of Chief Reinhardt, this does not support the defendants' argument if Stangle himself should be considered a County employee. Employees who are subject to the exclusive supervision of a company's mid-level manager are still considered employees of the company, not of the manager. And it does appear from the record that Stangle was as much a County employee as anyone else who worked for the Districts. His termination form, filled out when he retired, was a Douglas County Personnel Action Form. Just before he retired, there was a "small gathering of people"—apparently a retirement party—at which Stangle was presented with a cake, and a "20-year plaque" commemorating "20 years of service with Douglas County." Stangle Dep. at 58.

As evidenced by several statements made during his deposition, Stangle would almost certainly appear to have regarded himself as a County employee prior to the institution of this lawsuit. For instance, when questioned about applying for his pension, Stangle stated: "The form, the forms were filled out weeks after I left and resigned from the County or from the fire district, okay. And the forms were related to my hypertension. I resigned from the County because I had an option." After this statement, defendants' counsel essentially prompted Stangle to correct himself, by breaking in with, "From the District?" Stangle responded to this by stating, "I'm sorry, I keep saying the County. The District, because it is the District. I resigned from the District . . . ." He also evidenced significant confusion over which County officers were or were not ex-officio officers of the Districts, lending credence to the idea that the distinction was largely academic, and that in practice no one bothered to distinguish much between County functions and District functions.

Besides Stangle's likely status as a County employee, everything discussed above under the first factor, "interrelation of operations," also supports the idea that the County exercised control over the Districts' "labor relations." Witness the personnel forms, the sexual harassment policy, etc. In addition, Stangle testified that the Douglas County personnel department would advertise for applicants when the Districts were looking to hire new employees. Perhaps the strongest statement of the County's involvement comes from Chief Reinhardt's deposition testimony, however. When asked who was involved in making personnel decisions for the Districts, the following exchange took place:

Q. Say like a termination, who is consulted, who renders advice, who is involved in that decision?

A. The district being separate from the County, the ultimate decision would lie with the fire chief.

Q. You?

A. Yes, but I would consult—well, up until a couple, a year ago, there was no formal agreement between the County and the District. I was advised when I took this job that there had been a grand jury investigation in a personnel matter and that the District had been advised to any personnel matters to seek advice from the personnel department or human resources.

Once we had our interlocal agreement between the County and the District, I would still utilize the personnel department and the District Attorney's office and personnel manager.

Q. So that agreement went on line about a year ago?

A. Yeah.

Q. So it was well after May of '96?

A. Yes.

Q. All right. Now, prior to that agreement, say, let's talk about May 1996, what was the, how were personnel decisions made; who was involved and how did it work?

A. Because of what was told to me when I took the job, I was, I involved the District Attorney's office and the County's personnel department.

Q. How was the County's personnel department involved?

A. We made sure if there was a personnel question that we were following correct personnel policies, procedures, laws, ordinances.

Q. Did the District have any policies, personnel policies that were different from the County's personnel policies?

A. No, not that I know of.

Q. So in other words, would you consult the County personnel department to find out whether the policies that both the District and the County had, which were identical, whether those policies were being correctly followed?

A. Yes.

Q. And did you take the advice that you got from the County personnel people seriously?

A. Yes, I do.

  *     *     *     *     *     *

Q. And you relied on that advice; didn't you?

A. Yes, I did.

Q. Can you think of any situation where you didn't follow the advice given by the County personnel?

A. I can't think of any.

Reinhardt Dep. at 23–25. This testimony supports the idea that the County played a major and systematic role in the Districts' personnel decisions—one which was not simply an occasional thing, done for the sake of convenience. It does not appear that the Fire Chief is free to make such decisions without consulting the County personnel department in some fashion, even if only to make sure that the decision appears to conform with the law. Thus it is clear that this factor as well weighs in favor of the plaintiffs.

### 4. Common Management or Financial Control

As for the fourth factor, the County has more success with its arguments. The Districts are, for the most part, financially independent of the County. They have their own ability to raise revenue, by imposing taxes, and their funds are at all times kept separate from the County's. They own their own property, independent of the County. They also have separate accounting records from other County operations, and different tax identification numbers. The Districts are subject to separate annual audits, and are required to file separate tax statements. These facts certainly cut against the plaintiffs' argument.

However, even here all is not so cut and dried. While the Districts can raise their own money, they cannot keep it in their own account—the money is placed in an account held in Douglas County's name, albeit a separate one from the County's own. All checks going to pay the Districts' debts are issued by Douglas County, and show Douglas County as the payor. Hence all of the Districts' employees receive their paychecks from Douglas County. The same treasurer is responsible for the District's accounts and the County's, and even if he acts in his ex-officio capacity in managing the Districts' funds there is still some element of common control.

Nonetheless, this factor does appear, overall, to tip in favor of the defendants' position. Given the evidence presented under the other factors, however, and the fact that we must view the evidence in the light most favorable to the plaintiffs at this stage of the case, we cannot grant the defendants' motion

for summary judgment on the basis that Douglas County is not the plaintiffs' employer.

Since we have determined that the plaintiffs have raised a sufficient question as to Douglas County's status as the plaintiffs' employer to withstand summary judgment, we must continue with the Title VII analysis. Under Title VII, "unlawful employment pratice[s]" based on "sex" can include both "hostile environment" claims and "quid pro quo" claims. Both plaintiffs raise both types of claims, as well as retaliation claims. Defendants challenge all claims in their summary judgment motion. We will address each type of Title VII claim separately below.

## B. Hostile Environment Claims

Both plaintiffs have raised hostile environment claims against the defendants, based on the conduct of Deputy Chief Stangle. Defendants have challenged both the sufficiency of the evidence showing that Stangle's conduct amounted to harassment, and whether they can be held liable for such harassment if it is found to exist.

■ To make out a hostile environment claim, the plaintiffs must show that the harassment they suffered was "sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quotation omitted). When there is sufficiently severe or pervasive harassment, there is no requirement that any tangible loss or injury be suffered. *See id.* at 64, 106 S.Ct. 2399. However, the conduct must be both objectively and subjectively hostile. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Whether a workplace environment is objectively hostile is determined from "the perspective of a reasonable person with the same fundamental characteristics" as the plaintiff. *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995). As the only "fundamental characteristic" of the plaintiffs in this case is that they are women (i.e., neither plaintiff claims to have been discriminated against on the basis of race, disability, age,

or anything else other than, or in addition to, sex), the standard in this case is essentially that of the "reasonable woman." *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1463 (9th Cir.1994); *Anthony v. County of Sacramento,* 898 F.Supp. 1435, 1447 (E.D.Cal.1995).

■ Both plaintiffs testified that Stangle had a habit of periodically brushing up against their breasts with his arms, as well as occasionally touching their hips and buttocks. Plaintiff Vandermeer testified that, while touring a newly built district facility, Stangle expressed a desire to "consummate" the building. She also testified that Stangle often complained about the state of his sex life, and expressed a desire to have an extramarital affair with another coworker. Both plaintiffs testified that Stangle behaved strangely on a business trip they took to Las Vegas, including: insisting that he have an adjoining room to the one plaintiffs were sharing, and showing up twice at the door to their room without being fully dressed. He gave each of the women $50 cash, apparently from his own pocket. While observing a performance at Treasure Island Hotel, he commented to the plaintiffs that he thought they would be aroused by the performers in the show, since they were so good looking. On the flight back from Las Vegas, he pretended to fall asleep and leaned heavily on plaintiff Macias.

Plaintiff Vandermeer also testified that Stangle signed her birthday card with the inscription, "I hope you're not too old for the stable, Don Stangle." Plaintiff Macias described a conversation in which Stangle told her that his son had gone to the doctor after performing oral sex on a stripper at a bachelor party. Both plaintiffs testified to hearing Stangle tell a rather explicit story about another experience with a stripper of some kind, which everyone refers to as the "Choir Boys" story, although there is some confusion about whether it was anecdote from a movie, a book, Stangle's own life, or somewhere else entirely. Stangle admitted to telling the story in his own deposition. Plaintiff Vandermeer testified that Stangle discussed with her and another female employee the existence of a new female contra-

ceptive, which he likened to Saran Wrap, and then either asked the women to bring a roll of Saran Wrap to work or said that he would bring one himself. Both plaintiffs, as well as Fire Chief Reinhardt, testified to hearing Stangle refer to women as "ankles," which both women stated he had defined for them as meaning "three feet short of a cunt." In addition, the plaintiffs presented the testimony of Pamela Condron, another County employee, that Stangle had physically harassed her in the past.

It is certainly true that "stray" remarks—even highly offensive ones—are not usually actionable. But such remarks when frequent, especially when combined with offensive touchings such as are alleged to have occurred here, certainly can create an environment that any reasonable woman (and, hopefully, many reasonable men as well) would find "hostile." The fact that Stangle may have made such remarks in front of men as well as women makes no difference at all. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463–64 (9th Cir.1994). It is, of course, impossible to formulate a bright line rule for when a hostile environment exists. But it doesn't take much to survive summary judgment in an employment discrimination case, since the standard that the defendants must meet to prevail at this stage is quite high. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996). Thus we clearly cannot say, when viewing the facts in the light most favorable to the plaintiffs, that no rational juror could find that a reasonable woman would have considered the plaintiffs' working environment to be objectively hostile.

Defendants also argue that, even if the objective part of the test could be satisfied, the subjective part could not. That is, while the hypothetical "reasonable woman" might have been offended by Stangle's conduct, the plaintiffs, in fact, were not. Defendants point to the fact that plaintiffs may have used vulgar language at work, participated in discussions about sex, and told "dirty" jokes. Even if such behavior would somehow preclude a finding that plaintiffs were offended by Stangle's conduct, which we find highly

doubtful, we cannot make such a determination at this time. It is true that the conduct must be both subjectively and objectively "hostile." *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. But there is testimony in the record from both plaintiffs that they did find Stangle's conduct to have created a hostile and unpleasant working environment—and we cannot choose to disbelieve such evidence in ruling on defendants' motion for summary judgment. That credibility determination is for the trier of fact to make at trial. *See Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1107 (9th Cir.1998).

Finally, the defendants argue that, regardless of whether Stangle's behavior amounted to a hostile environment, they cannot be held liable for his conduct. It is at this stage of the analysis that two very recent Supreme Court decisions become quite significant. The two decisions set forth a new test for when employers would be held liable for the harassing actions of their supervisors, essentially holding that employers would *always* be liable for the actions of their supervisors, unless they could prove an affirmative defense. The new test is as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed.Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth*, —— U.S. ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 2292, 141 L.Ed.2d 662 (1998). This obviates the necessity of determining whether the employer knew or

should have known of the harassing supervisor's actions. The defendants based much of their argument on their claim that they did not know, and had no reason to know, of Stangle's behavior. Unfortunately for the defendants, this will no longer suffice to preclude liability. However, the defendants have also argued that both plaintiffs failed to complain about Stangle's behavior, despite knowing about the County's sexual harassment policy. This might be enough to trigger the affirmative defensive, although the defendants will have to show that the plaintiffs *unreasonably* failed to report Stangle's behavior pursuant to the sexual harassment policy, and not merely that they failed to report it. (Assuming, of course, that the defendants can also show that they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," since both parts of the affirmative defense must be proven for the defendants to prevail.) Since the plaintiffs have argued that they had legitimate reasons for not reporting Stangle's behavior, including a belief that his supervisors already knew about it, and had done nothing, it will be up to the trier of fact to determine whether or not the plaintiffs did act reasonably. *See Burlington Indus., Inc. v. Ellerth,* 118 S.Ct. at 2262 (remanding case despite fact that plaintiff had clearly not complained about supervisor's harassment prior to quitting even though she knew about company's sexual harassment policy). Plaintiff Vandermeer also testified that another Deputy Chief, Warren Gay, when she did mention Stangle's behavior to him, essentially warned her against publicly accusing Stangle of anything. Thus it is clear that genuine issues of material fact exist as to whether the defendants can avoid liability for Stangle's actions by proving the affirmative defense, thereby precluding summary judgment.

Therefore, defendants' motion for summary judgment must be DENIED as to both plaintiffs' hostile environment claims.

## C. Quid Pro Quo Claims

■ Initially, we note that in their response to the defendants' motion, the plaintiffs concede that plaintiff Macias' quid pro quo claim should be dismissed. Pls' Opp'n to Mot. for Summ. J. (# 15), p. 2, lines 3–4.

Thus we will GRANT defendants' motion as to Macias' quid pro quo claim, and proceed to analyze only plaintiff Vandermeer's quid pro quo claim.

The Ninth Circuit has previously held that, to make out a quid pro quo claim of sexual harassment, a plaintiff "must show that an individual 'explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct.'" *Heyne v. Caruso,* 69 F.3d 1475, 1478 (9th Cir.1995) (quoting *Nichols v. Frank,* 42 F.3d 503, 511 (9th Cir. 1994)). The EEOC guidelines on sexual harassment give further guidance, defining such harassment as, in relevant part: "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual ...." 29 C.F.R. § 1604.11(a)(1)–(a)(2). Thus it appears that, while most successful quid pro quo plaintiffs have alleged that a job benefit was conditioned on the performance of some physical sex act, *see, e.g., Heyne,* 69 F.3d 1475, *Nichols,* 42 F.3d 503, this is not required to make out a prima facie case of quid pro quo sexual harassment. The "sexual conduct" that an employee may be required by a harasser to accept may simply be "verbal ... conduct of a sexual nature."

In their opposition to defendants' motion, plaintiffs state that "[t]he record shows that Mrs. Vandermeer responded unfavorably to Stangle's sexual advances, and to his sexual statements and conduct. Thereafter, Stangle initiated her termination." Pls. Opp'n to Mot. for Summ. J. at 23. The problem is that the facts to support this claim are weak as the record now stands. As defendants point out, Vandermeer admitted in her deposition that Stangle never actually asked her for any sexual relationship, or ever conditioned her employment on the performance of any sexual favors. Of course, it is clear that implicit quid pro quo sexual harassment is actionable, and that the demand of a physi-

cal sexual favor is not necessarily required. It is possible to imagine that a harasser might implicitly condition his victim's continued employment on her continuing, silent acquiescence to his verbal abuse. In other words, when she finally speaks up and objects to his conduct, he fires her.

However, even assuming that such a scenario would constitute actionable quid pro quo sexual harassment, the evidence presented in this case does not readily fit this pattern. Vandermeer has certainly provided evidence sufficient to survive summary judgment as to whether Stangle's behavior amounted to unwanted sexual conduct. This phase of the analysis is essentially the same as her hostile environment claim, discussed above. But there is no evidence showing whether she ever really did anything to indicate to Stangle that her attitude had somehow changed—that she was not going to put up with his behavior anymore. Of course, maybe he just got tired of waiting for her to pick up on his "implicit" signals that she should have sex with him. *If* she could prove that he fired her because she hadn't yet slept with him, this *would* seem to be a form of employment discrimination—i.e., an unlawful employment action based on Vandermeer's sex. But whether this would be quid pro quo harassment, whether the employers would be liable for such conduct, and whether she can, in fact, prove it, are questions still to be addressed.

For guidance, we turn again to the new Supreme Court cases discussed above in the context of the plaintiffs' hostile environment claims. In *Burlington,* the Court addressed the difference between hostile environment claims and quid pro quo claims, and concluded that the distinction between the two terms is not as significant as has been generally thought. The Court stated that "[t]he terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility." *Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Court noted that the boundaries of quid pro quo liability had

been pushed steadily outward, due to the fact that a successful quid pro quo claim allowed recovery from the employer on a vicarious liability theory, while hostile environment claims required some sort of actual or constructive knowledge on the part of the employer, thus motivating plaintiffs to cast their claims as quid pro quo claims regardless of the facts involved. *Id.* at 2262.

The new opinions focus instead directly on the question of whether vicarious liability should be imposed—rather than whether the harassment at issue should be characterized as hostile environment or quid pro quo. From this premise, the Court set forth a new test for determining when an employer should be liable for its supervisor's harassing behavior, as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed.Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 2292, 141 L.Ed.2d 662 (1998). In short, then, it appears that employers will *always* be vicariously liable for their supervisors' harassing behavior, subject only to the possibility that the affirmative defense set forth above may be available. The defense will be available "when no tangible employment action is taken" and will not be available "when the supervisor's harassment culminates in a tangible employment action, such as discharge . . . ." *Burlington Indus., Inc. v. Ellerth,* 118 S.Ct. at 2270;

*Faragher v. City of Boca Raton,* 118 S.Ct. at 2292.

There is no question but that Vandermeer suffered a "tangible employment action"— she was clearly fired. However, it is not clear that her termination was the "culmination" of Stangle's harassment. Thus, to the extent that Vandermeer may not be able to show that her termination resulted from Stangle's harassment, her "quid pro quo" claims simply merge into her "hostile environment" claims, discussed above—i.e., the defendants will be able to raise the affirmative defense. If she *can* show that her termination resulted from Stangle's harassment, than the defendants will not be able to avail themselves of the affirmative defense, and, to use the old terminology, Vandermeer's "quid pro quo" claim will survive.

The question, then, is whether Vandermeer can show that Stangle's harassment "culminated in" her termination. The best way to analyze this question would seem to be the familiar burden-shifting analysis of most straightforward employment discrimination cases. That is, the plaintiff must first establish a prima facie case of discrimination, to which the employer must respond with a legitimate, nondiscriminatory explanation for its actions. Then the plaintiff must offer evidence that the employer's stated reasons are pretextual. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994).

To establish a prima facie case of discrimination, Vandermeer "must offer evidence that gives rise to an inference of discrimination." *Cordova v. State Farm Ins. Cos.,* 124 F.3d 1145, 1148 (9th Cir.1997) (quotation omitted). To do so, she may rely on either a presumption arising from factors such as those set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or on more direct evidence of discriminatory intent. *Wallis,* 26 F.3d at 889. But the amount of evidence needed to establish a prima facie case "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* Rather than relying on a *McDonnell Douglas* presumption (which might not be

possible, given that there is no evidence in the record to suggest that men in similar positions with similar performance records were not terminated, or even that any man had ever held a similar position with the Districts), Vandermeer appears to rely solely on the same evidence discussed in relation to the hostile environment claims—that is, evidence that Stangle often made highly offensive remarks, engaged in unwanted touching of various women in the office, including Vandermeer, indicated a desire to have an extramarital affair, and generally engaged in inappropriate and degrading sexual conduct with women he supervised. Given that the amount of evidence necessary to make out a prima facie case of discrimination is so low, and need only give rise to "an inference" of such discrimination, *Wallis,* 26 F.3d at 889, the evidence Vandermeer has presented, while not overwhelming by any means, does appear to make out a prima facie case. If evidence of a supervisor's derogatory racial comments can support an inference that an employer was motivated by impermissible racial bias, *see U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 n. 2, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), it would seem equally true that evidence of a supervisor's harassment of women employees would support an inference that the supervisor was motivated by impermissible and discriminatory views of women. *Heyne,* 69 F.3d at 1479; *EEOC v. Farmer Bros. Co.,* 31 F.3d 891, 897–98 (9th Cir.1994).

Since we find that Vandermeer has presented sufficient evidence to survive summary judgment on the issue of whether she has made out a prima facie case, we turn to whether the defendants have articulated legitimate, nondiscriminatory reasons for why Vandermeer was fired. Unquestionably, they have. Vandermeer was accused of falsifying bills sent to Medicare, falsifying her daily time cards, conducting personal business over the phone during the workday, lying on her resume, and being rude and hostile to her co-workers. These are all excellent reasons to fire an employee.

However, Vandermeer has alleged that these reasons are all pretextual. She points to the fact that Stangle had, completely on

his own initiative, obtained a raise for her only months before she was terminated—a raise which was then immediately struck down by the County as inappropriate for an employee who was still in her probationary period. She also points to the fact that, notwithstanding the alleged inaccuracies of the Medicare billing, the County never attempted to correct the matter with Medicare, and Medicare never contacted the County to demand any refunds. Macias testified that she had not observed any major personality problems or clashes between Vandermeer and other employees. In addition, Macias' evaluations indicate that she, too, had at one time been accused of using the phone to conduct personal business while at work, and had merely received a warning not to do it again. Vandermeer also disputes whether her resume was truly falsified, or whether it was a simple "misunderstanding." Of course, it is true that a plaintiff cannot simply rely on her prima facie case to rebut a defendant's proffered reasons as pretextual, *St. Mary's Honor Center,* 509 U.S. at 506–07, 113 S.Ct. 2742, but Vandermeer has clearly offered enough evidence on this point to survive summary judgment. Whether a jury will believe Vandermeer's testimony remains to be seen—but, again, we cannot make that sort of credibility determination at this time. *See Draper,* 147 F.3d at 1107. Therefore, defendants' summary judgment motion must be DENIED as to plaintiff Vandermeer's quid pro quo claim.

### D. Retaliation Claims

Both plaintiffs present retaliation claims as well. To make out a retaliation claim, a plaintiff must show: 1) that she was engaged in a protected activity; 2) that she then suffered an adverse employment action; and 3) that there is a causal link between the protected activity and the adverse employment action. *Tarin v. County of Los Angeles,* 123 F.3d 1259, 1264 (9th Cir.1997); *Payne v. Norwest Corp.,* 113 F.3d 1079, 1080 (9th Cir.1997).

Generally, a "protected activity" includes "protesting an unlawful employment practice." *See Trent v. Valley Electric Ass'n, Inc.,* 41 F.3d 524, 526 (9th Cir.1994).

Filing a complaint with the EEOC or NERC is undoubtedly such an activity. *See Payne,* 113 F.3d at 1080. The plaintiffs in this case did file such a complaint. However, plaintiff Macias has not presented any evidence that remotely suggests she suffered an "adverse employment action" at all, let alone as a result of her filing a complaint with NERC. Thus there is no way that Macias can succeed on her retaliation claim.

Plaintiff Vandermeer, on the other hand, did suffer an "adverse employment action." She was fired. But she was fired long *before* she filed her complaint with NERC. While she may not have been fired for legitimate reasons, she was not fired as a result of complaining to NERC. Nor has she presented any evidence whatsoever to show that she had engaged in some other "protected activity" before her termination. Thus plaintiff Vandermeer's retaliation claim fails as well, and we must GRANT summary judgment to the defendants on both plaintiffs' retaliation claims.

### II. Section 1983 Claims

Both plaintiffs have also raised claims under 42 U.S.C. § 1983. Section 1983 requires a plaintiff to prove that "(1) a person acting under color of state law (2) committed an act that deprived her of some right, privilege, or immunity protected by the Constitution or federal law." *Anthony v. County of Sacramento,* 898 F.Supp. 1435, 1451 (E.D.Cal.1995). Sexual harassment is clearly discrimination on the basis of sex, which is a violation of the Equal Protection Clause. *See Roberts v. College of the Desert,* 870 F.2d 1411, 1415 (9th Cir.1988). A county or other local government entity is a "person" within the meaning of the statute. *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, under § 1983, counties are not vicariously liable for the acts of their supervisors, unlike under Title VII. *Id.* at 691, 98 S.Ct. 2018.

Plaintiffs can establish the defendants' liability in three ways: (1) by proving that the supervisor acted in conformity with a "policy" or "custom" of the defendants,

which was the "moving force" behind the harassment, *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); (2) by showing that the supervisor had "final decision-making authority," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); or (3) by proving that the supervisor's actions were ratified by someone with "final decision-making authority," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Plaintiffs have not presented any evidence to show that the defendants had a policy or custom of sexually harassing women, let alone one that was the "moving force" behind the harassment, so they cannot succeed under the first method.

■ The remaining two methods offer more hope, however. There is quite a bit of evidence in the record that, although Stangle and Reinhardt had to comply with County personnel procedures, the final decisions regarding the Districts' staff were almost entirely left up to them. Thus either Stangle had "final decision-making authority" over the plaintiffs, and they can proceed under method number two, or Reinhardt had such authority, and they can proceed under method number three. The third method will no doubt be more difficult, since it is not clear that Reinhardt knew enough about Stangle's actions to be said to have ratified them, but he has admitted that he did hear Stangle refer to women in a derogatory manner, and that Stangle had been a personal friend of his for much longer than either of them had worked for the Districts. Thus there is sufficient evidence to preclude summary judgment on the plaintiffs' § 1983 claims, although we note that much of this evidence was introduced by the defendants themselves in an effort to show that Douglas County was not the plaintiffs' employer and should be dismissed from the case.

■ We note that the defendants also argued that plaintiffs' § 1983 claims should be dismissed because they are preempted by Title VII. This argument is without merit. The Ninth Circuit has held that § 1983 claims based on violations of the Equal Protection Clause are not preempted by Title VII. *Roberts*, 870 F.2d at 1415. It is true that *Roberts* was decided prior to the 1991 Civil Rights Act, which expanded the range of remedies available under Title VII. However, there is no indication that Congress intended to cut off § 1983 availability by amending Title VII. Since the purpose of the 1991 Act was to provide additional remedies to victims of discrimination, we see no reason to infer that the remedies available under § 1983—which are still greater than those available under Title VII—are no longer available to those with an Equal Protection claim.

### III. State Law Claims

Originally, both plaintiffs brought claims of negligence for the defendants' failure to maintain a workplace free of "hostile sexuality." In their opposition to the defendants' motion for summary judgment, however, both plaintiffs acknowledged that their negligence claims should be dismissed. Therefore, we GRANT summary judgment to the defendants on both plaintiffs' negligence claims.

*IT IS, THEREFORE, HEREBY ORDERED* that the defendants' motion for summary judgment (# 12) is *GRANTED* in part and *DENIED* in part, as follows:

1. Summary judgment is GRANTED to all defendants and against both plaintiffs as to their state law negligence claims (i.e., the Complaint's Third Cause of Action), and as to their retaliation claims (the Complaint's Fourth Cause of Action).

2. Summary judgment GRANTED to all defendants and against only plaintiff Macias as to her quid pro quo claim (the Second Cause of Action).

3. Summary judgment is DENIED to all defendants as to both plaintiffs' hostile environment claims (First Cause of Action), both plaintiffs' § 1983 claims (Fifth Cause of Action), and plaintiff Vandermeer's quid pro quo claim (Second Cause of Action).